HOWARD VEIT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5862. Promulgated April 14, 1947.

*Adrian A. Kragen, Esq.,* and *Leon H. Levi, Esq.,* for the petitioner.
*Earl C. Crouter, Esq.,* for the respondent.

810

814

**OPINION.**

BLACK, *Judge*: 1. Petitioner in his brief states the first issue to be decided as follows: "Can the doctrine of constructive receipt be used to attribute the receipt of income to a taxpayer on a cash receipts and disbursements basis in a year in which he did not have the right to receive the income and did not in fact receive the income?" It will be noted that this issue was raised by petitioner's assignment of error (b), hereinbefore set out.

Our findings of fact show that in the year 1940 the amount which petitioner was entitled to receive as his share of 1939 profits under the contract of January 2, 1939, had been ascertained. The amount of petitioner's share in the 1940 profits had not yet been ascertained. It was not to be ascertained until in May of 1941.

By November 1, 1940, petitioner had decided to change his status with the corporation. For several years petitioner had been executive vice president of the corporation in charge of sales, production, and styling. In 1940 he decided he would move to California and take things easier. He discussed his plans with Leon Lowenstein, president of the córporation, and it was finally agreed between them that, after moving to California, petitioner in 1941 should supervise the business of the corporation in territorial United States west of Denver, Colorado, comprising the following states: Utah, Arizona, California, Oregon, Nevada, Washington, Idaho, Wyoming, and Montana. For his services petitioner was to receive a salary of $15,000 and a possible bonus. The facts show that petitioner did receive a bonus of $25,000 in 1941 in addition to his regular salary of $15,000. This was returned by him and his wife on a community property basis, and concerning this particular $40,000 there is no controversy between the parties. Under the contract of November 1, 1940, between petitioner and the corporation, under which he received his salary of $15,000 and bonus of $25,000 for 1941, it was agreed between petitioner and the corporation that, as a part of the consideration for the contract, petitioner would receive the balance due him as his share of the profits for 1939 as follows: $20,000 in cash on the signing of the agreement, the balance of $55,000 to be paid in equal installments of $13,750 each on March 1, June 1, September 1, and December 1, 1941. This agreement was carried out and in 1941, which is the taxable year before us, petitioner received the $55,000 which was still due him as his share of the profits of the corporation for the year 1939. He and his wife returned this $55,000 for taxation in 1941 on a community property basis, and that presents the only issue which we have to decide as to this particular $55,000. We decide it later under issue 2.

Now, as to petitioner's share of the corporation's profits for the year 1940, this had not yet been determined when the new contract of November 1, 1940, was entered into. However, in the contract and as a part of the consideration for it, it was agreed between the parties that whatever petitioner's share of the profits for 1940 should prove to be, they should not be payable in 1941, as the original contract provided, but should be payable in 1942 in four equal quarterly installments on March 1, June 1, September 1, and December 1, 1942. Petitioner's share of the profits for 1940 was on June 18, 1941, ascertained by agreement of the parties to be $87,076.40, which it was agreed in carrying out the contract of November 1, 1940, should be paid petitioner, with interest at the rate of 1½ per cent per annum from October 1, 1941, in four equal installments of $21,769.10 on March 1, June 1, September 1, and December 1, 1942.

Respondent has determined that this $87,076.40 was constructively received by petitioner in 1941 and should have been returned by him for taxation in that year as his separate property. Respondent's action in that respect is the issue we have to determine under the assignment of error we are now discussing. We think it must be determined in favor of petitioner. Respondent, in contending that petitioner constructively received the $87,076.40 in question in 1941, relies on Treasury Regulations 111, section 29.42–2.[1] That regulation, dealing with constructive receipt, has often been approved by the courts.

However, we think that the facts present in the instant case show clearly there was no constructive receipt by the petitioner in 1941 of the $87,076.40 in question, as defined by the regulation referred to. Petitioner, prior to November 1, 1940, had decided that he would move to California and take things easier. He talked things over with Leon Lowenstein, president of the corporation, and it was finally agreed that petitioner would continue in the employment of the corporation, but on a restricted basis. The terms of this new employment were embodied in a contract dated November 1, 1940, which is in evidence. As a part of this new employment contract and as one of the considerations for it, petitioner agreed to defer the receipt of his share of the 1940 profits, at that time undetermined, until 1942, when it was to be paid to him in four equal installments. The whole agreement of November 1, 1940, was an arm's length business transaction entered into by petitioner and the corporation which was regarded as mutually profitable to both. The only way we should be justified in holding that petitioner constructively received the $87,076.40 in 1941 would be to hold that the agreement to defer the payment of such $87,076.40 until 1942 was a mere subterfuge and sham for the purpose of enabling petitioner to postpone his income tax on the amounts involved to another year. The evidence does not justify such a holding, but, on the contrary, seems to establish that the agreement to defer the payments until 1942 was an arm's length contract, arrived at in the ordinary course of business.

As we have already pointed out, in this same agreement it was provided that petitioner should receive the balance of profits for

---

[1] * * * Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.

1939 in 1941, and he did actually receive them as agreed, and he has returned them for taxation. Petitioner testified at the hearing of this proceeding, and in the course of his testimony he was asked why in the contract of November 1, 1940, it was provided that the payment of his share of 1940 profits should be deferred from 1941 to 1942, with an agreement that the corporation should pay him interest on the amount due from October 1, 1941, to the dates payments were made. His answer to this inquiry was:

It was the habit of Lowenstein to defer payments to me, other employees as well, when they extended employment terms. Accruables that ran from 1931 to 1935 were not paid me until 1937. A profit accruable of 1936 was not paid me until 1939. There was always a discussion on these payments on my part, that due to the fact that the company charged me interest on capital and surplus before a determination of the profits, that when they deferred payment which I always recorded on a cash basis, in accordance with the law, they should pay me interest. While I was never successful in having them do that—so in this last contract referred to, when Mr. Lowenstein was, as I testified yesterday, anxious to keep me under his thumb, he voluntarily stated that he would make a small token payment in order to make me happy, because I had been contending with him about it for years. It was his proposition.

Petitioner's testimony as above given was corroborated by two other witnesses, Erich Kath, comptroller of the corporation, and Leon Lowenstein, president of the corporation. They testified by deposition, and part of our findings of fact is based on their testimony. Petitioner is an interested witness, and that fact should, of course, be taken into consideration in weighing his testimony, and we have done so. However, there is nothing to show that Kath and Lowenstein have any interest whatever in the outcome of this tax controversy.

The corporation, being on the accrual basis, deducted in its 1941 return the full amount of the $87,076.40 as an accrued liability due Veit, and it was allowed the deduction. Its right to such deduction is not in any way affected by the outcome of this proceeding. Therefore, taking into consideration all the evidence, we fail to see where there is any justification for applying the doctrine of constructive receipt to the $87,076.40 in question.

Petitioner cites and relies on *Kay Kimbell*, 41 B. T. A. 940, as a case which strongly supports his contention. We think it does. In the *Kimbell* case the taxpayer had transferred certain oil leases to a corporation upon an oral agreement on its part to pay Kimbell $15,512.70 upon transfer, and, commencing on January 1, 1934, to pay him a proportion of the oil production until oil to the value of $114,250 had been received. Shortly prior to January 1, 1934, another oral agreement postponed this oil payment, so that payment was to begin September 16, 1936, and continue until oil of the specified value

was received, together with an additional $15,000. The Commissioner assessed a deficiency for the years 1934 and 1935 on the theory of constructive receipt of the oil involved during those years. In its opinion, holding that the Commissioner's action was erroneous, the Board of Tax Appeals said:

\* \* \* It is only by giving recognition to the first oral agreement entered into at the time the leases were assigned to the corporation that respondent has any semblance of reason for his determination that the individuals constructively received the income in question. If the parties had a right to make the first oral agreement, they had a right to make the second, and our only concern is whether these agreements actually existed and were intended as real, genuine, bona fide agreements between the parties. \* \* \*

The facts of the instant case appear to correspond closely to those in the *Kimbell* case. In both cases there was an agreement to pay at a particular time indefinite amounts, and, prior to the date on which those amounts were due or could be determined, payment was deferred. The Board of Tax Appeals found that the agreements in the *Kimbell* case were bona fide.

As we have already stated, we find that the agreement of November 1, 1940, entered into between petitioner and the corporation, by which, among other things, it was provided that payment of petitioner's share of the 1940 profits should be deferred from 1941 to 1942, was bona fide and entered into in a business transaction at arm's length. This being true, it naturally follows that the *Kimbell* case is applicable and controlling. The cases cited and urged by respondent are all distinguishable on their facts, and it would not serve any useful purpose to discuss them in detail here. On this issue we hold for petitioner.

We think we should point out that the evidence shows that in a subsequent contract entered into December 26, 1941, the petitioner and the corporation changed the dates of the payment of the $87,076.40 here in question from four equal payments of $21,769.10 each in 1942 to five equal installments of $17,415.38 each during 1942, 1943, 1944, 1945, and 1946. We do not have the year 1942 before us, and we express no opinion as to whether this contract of December 26, 1941, operates to make inapplicable the doctrine of constructive receipt for the year 1942. In other words, we express no opinion as to the effect of the contract of December 26, 1941.

2. Petitioner states the second issue in his brief as follows: "Is income received by a taxpayer while residing in a community property jurisdiction community property or separate property where the source of the income was a contract executed while the taxpayer was a resident of a non-community property state but the taxpayer's right to any income was completely inchoate prior to the establishing of resi-

dence in the community property state." This issue was raised by petitioner's assignment of error (a).

For purposes of clarification we point out that, having held under issue 1 that petitioner did not constructively receive the $87,076.40 in question in 1941, that amount is not involved in the issue we are now discussing.

The income which is here subject to our decision as to whether it was community property or separate property is the $55,000 which petitioner did actually receive in 1941 as his share of the profits of the corporation for 1939 and which he and his wife returned for taxation. We fail to see where there was anything "incohate" about this $55,000. When petitioner and his wife took up their domicile in California on November 30, 1940, petitioner had definitely received $20,000 in cash on 1939 profits when the new agreement was signed on November 1, 1940, and the corporation agreed to pay him the remainder in 1941 in four equal installments of $13,750 each. There were also some payments of petitioner's share of 1939 profits other than those just mentioned, but they were made in 1940 and are not here involved.

The testimony of Erich Kath, petitioner's comptroller, was to the effect that the corporation took as a deduction on its income tax return for 1939, as an accrued liability for "salary expense," the amount of petitioner's share of 1939 profits under the contract, which was $81,999.93. If this liability to petitioner was sufficiently fixed and certain to entitle the corporation to a deduction on its income tax return as a salary expense, it certainly was sufficiently fixed and definite to establish petitioner's property interest therein as his separate property under the laws of the State of New York, though, of course, he, being on the cash basis, would not be taxable on the amount until it was actually received. The years of actual receipt by petitioner of his share in 1939 profits were the years 1940 and 1941. Therefore, it seems clear that petitioner's right to the additional compensation for 1939 became vested while he was domiciled in and a resident of New York. This right to the additional compensation was subject to being defeated by his not remaining in the corporation's employ for the entire two-year period and by remote possibility that the corporation might have no net profits for the 1939–1940 period. Petitioner, however, did remain in the corporation's employ for the entire period, and the corporation did have substantial net profits for both years.

Since the right to the additional compensation for 1939 was earned while petitioner was domiciled in and a resident of New York, a non-community property state, it was his separate property in that state. The question is whether or not this right to the additional compensation remained the petitioner's separate property although it was

actually paid and received subsequent to the establishment of his domicile in a community property state.

Questions relating to the ownership of income acquired after petitioner and his wife established their legal domicile in California must be determined under the laws of that state. *Poe v. Seaborn*, 282 U. S. 101. In *In re Arms' Estate*, 186 Cal. 554; 199 Pac. 1053, 1056, the California Supreme Court said:

\* \* \* It has long been the established law of this state that where a husband brings into this state money or property acquired by him during coverture in another state, by whose laws it was his separate property, it remains his separate property after it reaches this state, and that any property acquired therewith in this state, either by purchase or exchange, is also the separate property of the husband. \* \* \*

Cf. *In re Bruggemeyer's Estate*, 115 Cal. App. 525; 2 Pac. (2d) 534; *Asher v. Welch* (Dist. Ct. Calif., 1938).

We, therefore, hold that the respondent was correct in determining that the $55,000 received by petitioner as additional compensation in 1941 for profit participation for services performed during 1939 under the contract of January 2, 1939, was petitioner's separate income. Cf. *C. J. Wrightsman*, 40 B. T. A. 502; affd., 111 Fed. (2d) 227; *Robert H. Lord*, 30 B. T. A. 425; *John M. King*, 26 B. T. A. 1158; affd., 69 Fed. (2d) 639.

Petitioner, in contending that the $55,000 in question received by him in 1941 was community property of himself and his wife, cites and strongly relies on *Fooshe v. Commissioner*, 132 Fed. (2d) 686, reversing 46 B. T. A. 205. We think that case is clearly distinguishable on its facts. In that case the taxpayer entered the employ of an insurance company in 1919 as manager of its agency in St. Louis, Missouri. That employment contract provided that he would receive as part of his compensation 2½ per cent on renewal premiums when collected and paid to the company on policies written by him or through him under this contract. In the event the contract was terminated, the petitioner was to receive the 2½ per cent commission upon the renewal premiums, less a collection fee of 2 per cent, that is, petitioner upon leaving the agency would receive only ½ per cent on renewal premiums and the 2 per cent would be lost to him. The insurance company decided to transfer petitioner to Los Angeles, California, as manager of that agency. The taxpayer was agreeable to this, except for the matter of compensation under the new California contract. This contract did not contain the provision for 2½ per cent on collection of renewal premiums, as did petitioner's old Missouri contract. In order to induce petitioner to take charge of the company's Los Angeles office and in order that he would be more fully compen-

sated for his services in California, the company agreed to waive the collection charge of 2 per cent out of the renewal premiums paid on the St. Louis policies. The old contract was thereafter canceled and the taxpayer entered into the contract to manage the Los Angeles agency. The taxpayer arrived in Los Angeles on May 1, 1938, and established his domicile. At the end of 1938 he received $21,504.80, being equal to the 2½ per cent of the renewal commissions he would have received had he not given up his Missouri employment. Taxpayer reported this income as community property. Respondent determined a deficiency on the theory that it was taxpayer's separate property, which the Board of Tax Appeals sustained. No question was raised on appeal concerning the status as taxpayer's separate property of the ½ per cent renewal commission which came to him under the old contract, regardless of its termination. Taxpayer's contention was that the amount received because of the waiver of the 2 per cent collection fees on renewal premiums was community property, since such fees represented part of his compensation as manager of the Los Angeles agency. The Ninth Circuit agreed with taxpayer's contention that the amount received from the waiver of the 2 per cent collection fee was part of the compensation paid taxpayer for his services in California and, hence, was community property. The Ninth Circuit also did not agree with the respondent's contention that the payments must be deemed separate property because the contract providing for the taxpayer's employment in California was entered into while the taxpayer was domiciled with his wife in Missouri, a noncommunity property state. The court pointed out that, "so far as concerns contracts for the payment of money the doctrine of inchoate rights, fixing the separate character of such moneys received by the spouse after marriage, upon a contract made before, does not exist in California." It held that the wife acquired a community interest in the 2 per cent collection fee paid after the beginning of the taxpayer's management of the Los Angeles agency because it was part of the compensation for services performed by the taxpayer while domiciled in California.

In the instant proceeding, petitioner had performed all of the services giving rise to the additional compensation while he was domiciled in and a resident of New York, and the $55,000 in question paid petitioner in 1941, while he was domiciled in and a resident of California, was for services completed in New York, a noncommunity property state. None of it was payment of compensation for any services which he rendered in California. These facts, it seems to us, clearly distinguish the instant case from *Fooshe* v. *Commissioner, supra.*

*Decision will be entered under Rule 50.*