William U. Watson v. Commissioner.
William U. Watson v. Commissioner
Docket No. 15869.
United States Tax Court
1949 Tax Ct. Memo LEXIS 216; 8 T.C.M. (CCH) 357; T.C.M. (RIA) 49089; April 20, 1949
Egbert Robertson, Esq., and Edmund L. McGibbon, Esq., 134 So. LaSalle St., Chicago, Ill., for the petitioner. Jackson L. Boughner, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding involves petitioner's income tax liability for the year 1945. The deficiency, as determined in the notice of deficiency, was $49,068.92. In his answer, respondent has claimed an increased deficiency in the amount of $25,710.92, making a total of $74,779.84. Three issues are presented: (1) The holding period for debentures Nos. 13 to 165, and the coupons appertaining thereto of the Greenduck Metal Stamping Co., purchased *217 by petitioner and subsequently retired by the company, for the purpose of determining whether the gain on the retirement thereof was long-term or short-term capital gain under section 117 of the Code; (2) the cost basis of such debentures and coupons, petitioner having computed the basis as $40,236.59, whereas respondent has contended for a basis of $26,562.50; and (3) the proper method of treating the sum of $5,408.96, the amount of attorneys' fees and costs, incident to arranging for the redemption of all of the debentures acquired by petitioner. Many of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. During 1945, petitioner was a resident of Chicago, Illinois, and filed his return for that calendar year, which was prepared on a cash basis, with the collector for the first district of Illinois. On January 1, 1930, petitioner was the owner of all the capital stock, consisting of 3,000 shares of the Greenduck Metal Stamping Co., an Illinois corporation (hereinafter sometimes referred to as Greenduck). In that same year Greenduck issued $150,000 of 6% debentures of the par value of $500 each. Each debenture was numbered from *218 1 to 300, inclusive. The debentures were secured by a trust indenture, under which the Chicago Title & Trust Co. was trustee. The debentures matured serially in the order of their serial numbers, at a rate of from $6,000 to $13,000 per year over the period January 1, 1931, to January 1, 1946. All debentures to and including the one numbered 165 had matured by their terms on or before January 1, 1940. They were subject to redemption and prepayment on any interest-payment date in the order of their serial numbers at par and accrued interest under the conditions and procedures specified in the trust indenture. They bore interest from their date until maturity at the rate of 6 per cent per annum, payable annually on the first day of each year. After maturity the debentures and the coupons bore interest at the rate of 7 per cent per annum until paid. Petitioner guaranteed full payment of the debentures and interest and full performance by Greenduck of all the terms, conditions, and covenants of the trust indenture. As additional security, there were deposited with the trustee policies of life insurance on petitioner's life in the amount of $80,213, with the provision that any money *219 received by the trustee by reason of such insurance should be applied to the redemption of the then outstanding and unpaid debentures. In January 1931 Greenduck paid debentures Nos. 1 to 12, aggregating $6,000, in par value, and paid the interest then due on the whole issue. It paid the interest due January 1, 1932, and January 1, 1933. It failed to pay any further interest and failed to pay or redeem any debentures due January 1, 1932, or thereafter until 1945, as hereinafter more fully described. On August 27, 1940, all of Greenduck's outstanding debentures and coupons, both defaulted and later maturing, were owned by the partnership of Campbell & Jordan. On that date petitioner entered into an agreement with Campbell & Jordan, to which agreement Greenduck and the debenture trustee were also parties, whereby the partnership agreed to sell and petitioner agreed to purchase all of the debentures, coupons, and interest obligations of Greenduck, then held by the partnership. Under the terms of this agreement, Campbell & Jordan agreed to accept in payment of the debentures and coupons the assignment to its nominee of the insurance policies on petitioner's life, referred to in the *220 trust indenture, and the sum of $50,000 payable at the rate of $416.67 per month, commencing September 1, 1940. It was provided that as payments were made by petitioner, there should be delivered to him the outstanding debentures of the longest maturity with coupons thereafter maturing but without any defaulted coupons, to the extent of the amounts paid by him in multiples of $500. When the payments made by petitioner equaled $50,000, he was to receive all of the remaining outstanding debentures with attached coupons, all defaulted coupons appertaining to debentures theretofore delivered to him, and an assignment of all of the rights of Campbell & Jordan in any accrued interest obligations on the debentures and coupons, so that as a result all of their interest in the debentures would be transferred to petitioner. Petitioner's right to acquire the debentures was conditioned upon full performance by Greenduck of all of the covenants of the trust indenture, excepting that relating to the payment of principal and interest on the debentures. Additionally, he and Greenduck were jointly and severally liable to continue the insurance policies in effect. The right, however, was accorded *221 petitioner, at any time before December 31, 1950, to acquire the policies by paying Campbell & Jordan the sum of $25,768, or by delivering his note in that amount. He did give his note to the partnership in that sum on July 10, 1945, and upon the payment of the note in January, 1946, he received the policies. Prior to January 1, 1945, petitioner paid in the monthly instalments provided for in the contract of August 27, 1940, totaling $21,666.84. By May of 1945 he made five additional monthly payments totaling $2,083.35. Not all such payments were made at the time specified, some having been made after the due date, but Campbell & Jordan did not object to this tardiness. By virtue of these payments, debentures numbered 279 to 300 had been delivered to petitioner. On June 20, 1945, petitioner acquired the remaining outstanding debentures from Campbell & Jordan, these being debentures numbered 13 to 278, upon the payment of $26,249.81. On that day, when the debentures were delivered to him, he took all which he received, together with those which he had theretofore acquired, and deposited them in a safe-deposit box, the same being in his name and his wife's, and they remained there, *222 without being removed, until December 28, 1945. Shortly before the acquisition by petitioner of the remaining debentures from Campbell & Jordan on June 20, 1945, J. B. Bond and G. S. Wilson became interested in acquiring Greenduck's stock. On June 5 and June 6, 1945, there were delivered to petitioner two letters from Bond and Wilson, the second being a supplement to the first, in which they recited the terms and conditions under which they sought to acquire Greenduck's stock, all of which petitioner still owned. These letters recited that the proposals were being made "subject to the approval of our counsel in connection with the legality of the procedure proposed herein, including a thorough examination and opinion on the debenture issue now outstanding * * *." It was further recited that the letters intended to convey "some basis for an agreement, presuming, of course, that a more formal and precise agreement will be drawn incorporating all of the terms and conditions necessary in a matter of this kind." By these letters the purchasers sought to acquire 2/3 of the outstanding capital stock of Greenduck for $10,000, with an option to obtain the remainder for $5,000. With reference *223 to the retirement of the debentures it was proposed in the letter of June 5 that Greenduck would retire over a period of five years $50,000 per year principal and interest on the debentures for a total payment on the outstanding issue of $250,000. This was modified in the letter of June 6, wherein it was proposed that Greenduck would immediately retire or earmark sufficient funds for the retirement of all of the principal amount of the outstanding debentures in the sum of $144,000. The payment of accrued and defaulted interest in the sum of approximately $163,000 was to be spread over a period of four years, and was to be secured by a chattel mortgage. These proposals were not accepted by petitioner within the time provided in the letters, but, on the contrary, were orally rejected by him. Among the reasons which prompted petitioner's rejection were the possible income tax consequences, the gain to be deprived upon redemption of the debentures being short-term capital gain; the fact that he had a tentative agreement with Howard Aircraft Co., which had not been finally closed out; that he had not as yet acquired the debentures; and his opinion that Greenduck's financial condition *224 was not sufficiently stable to permit the withdrawal of the sums necessary for the retirement of the debentures as provided in the letters. As of May 31, 1945, Greenduck had assets of $398,254.45. Its current assets totaled about $272,000, and its current liabilities were about $118,000. After the rejection of the proposals, as contained in the letters of June 5 and 6, petitioner and Bond and Wilson continued their negotiations, and on June 11, 1945, entered into an agreement for the purchase and sale of Greenduck's capital stock and the retirement of its outstanding debentures. The agreement provided, in part, that Bond and Wilson would purchase from petitioner on the closing date, June 19, 1945, 2,000 of Greenduck's 3,000 outstanding shares of stock for $10,000, and would purchase the remaining 1,000 for $10,000 on or before December 31, 1947. The purchasers, who by the acquisition of the 2,000 shares of stock would then be in control of the company, agreed to cause Greenduck to retire all of the outstanding debentures and coupons on or before June 28, 1949, for the total sum of $303,041.53. The retirement was to be in instalments payable as follows: "December 28, 1945, $163,880.18 *225 and quarterly thereafter beginning March 28, 1946, $9,940.09 until the full amount thereof shall have been paid, the company to have the right to prepay all or part of the unpaid balance at any time beginning December 28, 1945. This offer contemplates that no interest will be payable on said debentures or interest coupons which accrues subsequent to June 10, 1945. It is understood that the payments above stated shall be more or less in the amount stated, the intention being to make in each instance a payment which enables debentures and interest coupons (including computation of penalty interest on both) to be delivered for retirement in an aggregate amount closest to the figure stated, the actual payment to be in the amount of said aggregate computation. The undersigned, jointly and severally, personally guarantee the payment of the last four installments above set forth. "We further agree, for the purpose of protecting the debenture holders in the performance of the obligation to retire specified herein that until said retirement shall have been completed. "No cash dividends will be paid by said corporation. "The aggregate of executive salaries which said corporation shall *226 pay during any twelve month period shall not exceed $15,600.00, being the amount of the salaries presently payable to you and your wife. "No chattel mortgage or other lien or incumbrance shall be placed against the machinery and equipment, furniture and fixtures, tools and dies, belonging to said company and in the event that the same is done in violation hereof the effect thereof will be to impose upon the undersigned, jointly and severally, a guarantee of payment of any then unpaid installments above provided. "We will cause the Greenduck Metal Stamping Company to deposit with the First National Bank of Chicago in an agency account within three days after the closing date hereof the sum of $100,000.00 and to deposit in said account the following additional sums on or before the dates specified: $8,000.00 July 10, 1945; $8,000.00 August 10, 1945; $8,000.00 September 10, 1945; $8,000.00 October 10, 1945; $8,000.00 November 10, 1945; and $4,000.00 December 10, 1945; and to retain the same there until withdrawn by the Greenduck Metal Stamping Company for the purpose of being used to pay in part the sum of $163,880.18 payable hereunder on December 28, 1945, with instructions to the *227 First National Bank to notify Moses, Kennedy, Stein & Bachrach, 231 South LaSalle Street, Chicago, Illinois upon the withdrawal in whole or in part of said sums. However, you will have no legal or equitable interest in or title to said money or deposit account until the same is actually paid to you on December 28, 1945." Pursuant to the terms of the agreement of June 11, Bond and Wilson paid to petitioner on June 18, 1945, $10,000 as the purchase price of 2,000 shares of Greenduck's stock. On June 19, 1945, a meeting of the board of directors of Greenduck was held, and petitioner was elected assistant secretary of the company, and by resolution adopted on that day, it was provided that on the No. 2 account of Greenduck in the First National Bank of Chicago, in which account the sums for the redemption of the debentures were to be deposited, the checks should be countersigned by petitioner as assistant secretary. It was required, however, that checks on this account should also bear the signature of one of the officers, who were Bond and Wilson. On December 28, 1945, petitioner removed from the safe-deposit box Greenduck's debentures Nos. 13 to 165 with the coupons appertaining *228 thereto, and delivered them to the attorneys of Wilson and Bond and received from them two checks, both of Greenduck, totaling $163,464.38, one for $20,000 on one account and one for $143,464.38 on the No. 2 account, bearing the signature of Wilson as president and the counter-signature of petitioner. The check for $20,000 was endorsed over to Greenduck to pay petitioner's indebtedness to that company, and the other check he deposited in the joint account of himself and his wife in the First National Bank of Chicago. Petitioner's total cost of the 288 debentures subject to redemption by the company, together with accumulated and past-due interest thereon, was $50,000. Attorneys' fees and expenses incident to the retirement of all of the 288 debentures were $5,408.96. On his income tax return for the year 1945, petitioner reported the receipt of $158,055.42 for debentures numbered 13 to 165, a cost basis thereof of $40,236.59, and a long-term capital gain of $117,818.83 thereon, of which 50%, or $58,909.42 was taken into account in determining net income. The sales price of $158,055.42 represented the aforementioned $163,464.38, less attorneys' fees and expenses of $5,408.96. The *229 cost of $40,236.59 was computed by adding to the $50,000 paid Campbell & Jordan the $25,768 paid for the insurance policies, and multiplying the total of $75,768 by $158,055.42/$297,632.57, the numerator of said fraction being the net selling price as computed by petitioner of said debentures 13 to 165, and the denominator being the net selling price of the entire outstanding issue, after deducting from the gross selling price of $303,041.53 the above mentioned attorneys' fees and expenses of $5,408.96. In the notice of deficiency, respondent determined that petitioner received interest of $86,964.38. The balance of $76,500 was determined by respondent to represent the principal amount due on the debentures. Respondent determined that the total cost of all of the debentures acquired was $50,000, and that the cost of the $76,500 face value redeemed in 1945 was 765/1440 of $50,000 or $26,562.50. Respondent further determined that of the $76,500 received upon retirement of the bonds in 1945, $62,401.05 represented bonds purchased prior to 1945, and $14,098.95, bonds purchased during 1945. Respondent allocated the attorneys' fees paid of $5,408.96, as an expense on sale on the above *230 ratio of 765/1440, allowing $2,873.51 to bonds retired in 1945. Finally, respondent determined a long-term gain of $38,390.29 on the bonds acquired prior to 1945, and a short-term gain of $8,673.70 on the bonds acquired in 1945. In his answer respondent made a claim for an increased deficiency of $25,710.92. He asserted that debentures 13 to 165, inclusive, were sold or retired less than six months after their acquisition; that the debentures had a cost of $26,562.50 (765/1440 of $50,000); and that the amount received was $163,464.38 less a pro rata share of the attorneys' fees, or $2,873.51, making net proceeds of $160,590.87. Accordingly, respondent asserted that there was a gain on the transaction of $134,028.37, which was short-term capital gain in its entirety and not allocable $86,964.38 to interest, $38,390.29 to long-term capital gain, and $8,673.70 to short-term capital gain as set forth in the notice of deficiency. Petitioner held the debentures in question for more than six months. Opinion KERN, Judge: In the notice of deficiency, respondent treated portions of the money received by petitioner in 1945, upon retirement of some of the Greenduck debentures, as payment *231 of interest. By his answer, respondent has definitely abandoned this position. This view, he apparently recognized, had no legal support. See e.g. Adrian & James, Inc., 4 T.C. 708. In his answer, a new theory has been advanced, and new matter has been pleaded seeking an increased deficiency. In respect of any new matter pleaded in his answer, the burden of proof is upon respondent. Rule 32, Rules of Practice Before the Tax Court. There is no dispute as to the time of acquisition by petitioner of the Greenduck debentures which were subsequently retired by the corporation pursuant to the terms of the agreement of June 11, 1945. They were acquired by him, it is agreed, on June 20, 1945. The controversy under the first issue, as framed by the parties, centers on the time when petitioner was in receipt of payment for debentures numbered 13 to 165. Petitioner's position is that he held these debentures until December 28, 1945, when he surrendered them to Greenduck, and received payment for them. Respondent's theory is that the time of payment will, under the facts here present, *232 determine when the holding period of petitioner ended. As to the time when petitioner received payment, he contends that petitioner received constructive payment in the sum of $144,000 within six months from the date that the debentures were acquired. He reasons that by December 10, 1945, the corporation had deposited that sum in the agency account, as provided in the June 11 agreement. Respondent further argues that if petitioner had accepted the proposals, as contained in the letters of June 5 and 6, he could have received the $144,000 in June, but that he rejected these proposals principally because of the tax consequence, and that the agreement ultimately entered into differed substantially from the earlier proposal only in the respect that the money was to be deposited in a bank account rather than paid outright to petitioner. Respondent, upon brief, summarizes his argument thus: "It is not necessary, in deciding this case, to determine whether it falls under the rule of Gregory v. Helvering, (1935) 293 U.S. 465, or whether it is the type of case to which that rule does not apply. The petitioner here was offered $144,000.00 immediately for certain bonds. During *233 negotiations, he directed that the $144,000.00 be placed in a bank account requiring his counter-signature on checks. Whether we call it constructive receipt of cash or actual receipt of an economic benefit, the result is the same. Petitioner had the power and right to receive this sum immediately, and to all intents and purposes, debentures 13 to 165 were redeemed within six months of acquisition, Petitioner received the redemption money within that period, and the gain thereon is includible in its entirety, in his gross income." It appears that respondent believes that petitioner was in "constructive receipt of cash or actual receipt of an economic benefit" on December 10, 1945, to the extent of $144,000, although the position of respondent as to the date and amount of constructive receipt, or receipts, is not definitely stated. [1] It was on that date that the amount on deposit in the agency account aggregated $144,000, which sum was a part of the total amount to be used to retire debentures numbered 13 to 165. Respondent concedes that the difference between that amount and $163,464.38, the total received by petitioner on December 28, was received by petitioner more than six months *234 after the acquisition of the debentures, and should be taxed as a long-term capital gain. What we must determine is whether petitioner in fact "exchanged" the debentures, after holding them less than six months, although under the terms of the agreement and the intention of the parties he was to hold them until December 28, 1945, when they were to be retired. If that is the date to be used, there is a period of more than six months since their acquisition. We are of the opinion that, under the facts of this proceeding, petitioner held the debentures in question until December 28, 1945. Pursuant to the terms of the agreement of June 11 and the intention of the parties, that was the earliest date for their retirement; it was the date upon which the sums in the agency account were to be withdrawn for retirement of the debentures; it was the date upon which petitioner was to surrender and did surrender the debentures; and until the sum was actually paid to petitioner on December 28, 1945, he had "no legal or equitable interest in or title to said money or deposit account," and did not part with his ownership of *235 the debentures, nor had the corporation acquired any "legal or equitable interest in or title to" the petitioner's debentures. There was no intention that he part with the ownership of some on December 10, and others on December 28. The 153 debentures involved were treated as a unit and surrendered on December 28. No "exchange," Internal Revenue Code section 117 (f), can be said to have taken place of any part of them at any earlier time. That petitioner might possibly have had these bonds retired early in June, 1945, if he had accepted certain proposals then made, is of no material aid to respondent. The fact is that he did not accept those proposals, albeit one of his reasons for rejecting them was that it would lead to heavy taxes. A taxpayer need not adopt that form of transaction which leads to the greatest amount of taxes, and this is apparently what respondent seeks to have us hold. On the contrary, it has long been recognized "that if a method to minimize taxes is carried out by legal means and is bona fide and not a mere sham, it is not subject to censure. *236 " Clara M. Tully Trust, et al., 1 T.C. 611, 619. See United States v. Isham, 17 Wall. (84 U.S.) 496; Gregory v. Helvering, 293 U.S. 465. We look to what, in reality, was done, and not to what might have been done if the June 11 agreement had not been entered into by petitioner. Anna M. Harkness, 1 B.T.A. 127. Moreover, we can not subscribe to respondent's premise that this agreement was not materially different from the earlier proposals. A comparison demonstrates the substantial differences that existed, and these differences were dictated, we believe, by business considerations as well as possible tax savings. [2]
As to respondent's argument, urging the applicability of the doctrine of constructive receipt, his own regulations demonstrate its inappropriateness under the facts of this proceeding. *237 In Regulations 111, section 29.42-2, it is said, in part: "* * * To constitute receipt * * * the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt." It would be only by disregarding the terms of the agreement of June 11 that any possible merit could be discerned in this contention of respondent. This, on the basis of the record before us, we are not prepared to do. Kay Kimbell et al., 41 B.T.A. 940; Howard Veit, 8 T.C. 809. Nor does respondent so urge; nowhere does he characterize the June 11 agreement as a sham or subterfuge. In fact, from all that appears, it seems to us that it *238 "was bona fide and entered into in a business transaction at arm's length." Howard Veit, supra, at 818. Under the agreement, petitioner had no right to the sums on deposit in the agency account prior to December 28, 1948, and then only on the surrender of the necessary debentures. We fail to see how the doctrine of constructive receipt can apply in view of these facts. Cf. G.C.M. 5565, C.B. XIV-2, page 105; G.C.M. 17025, C.B. XV-2, page 155. The case cited by respondent, of which Hamilton National Bank of Chattanooga, Administrator, 29 B.T.A. 63, is an example, are inapposite. They stand for the general proposition that a taxpayer can not simply reject income which is wholly subject to his command or make it payable to his agent, and thereby insulate himself from tax thereon. Cf. Walter I. Bones, 4 T.C. 415. Respondent's fallacy in reasoning that these cases are applicable is that he assumes, contrary to the facts, that petitioner in the instant had unfettered control of the bank account in which the sum of $144,000 was deposited. The facts are that the funds were not "set apart to the taxpayer without any substantial limitation *239 or restriction;" that he had no present right to them, and his only authority, as provided by corporate resolution, was to countersign the checks drawn on this account. It should be noted in connection with this argument of respondent that its implications and the necessary logical steps in reaching the result contended for go beyond those ordinarily urged in the usual putative "constructive receipt" case. Here the respondent argues, that petitioner constructively received a part of the purchase price for his debentures on or before December 10, 1945. The implicit steps in his argument are that there was therefore a constructive payment at that time by the corporation; that there was, accordingly, a constructive retirement of the debentures at that time; and that there was then and thereby a constructive sale and exchange of petitioner's debentures. Since we have concluded that there was no constructive receipt by petitioner, it is unnecessary to consider the validity of the other steps implicit in respondent's contention on this point. Respondent seeks to justify his position further by seeking to find some support in cases where an employer purchases an annuity for an employee, *240 and the latter is held taxable on the payments made for the purchase of the annuity. Respondent cites Richard R. Deupree, 1 T.C. 113, Renton K. Brodie, et al., 1 T.C. 275, Oberwinder v. Commissioner, (CCA-8), 147 Fed. (2d) 255, and J. H. McEwen, 6 T.C. 1018. These cases are relied upon by respondent to buttress his contention that petitioner received a "taxable economic benefit" when the deposits were made in the bank account, as they were thereafter out of the control of the corporation. None of the cited cases is of particular assistance to respondent, and all are distinguishable on their facts. Whatever economic benefit was received by the taxpayers in those cases was an "economic or financial benefit conferred on the employee as compensation for personal services." J. H. McEwen, supra, at 1026. The question presented in each was whether any amount representing such compensation was includible in the taxpayer's gross income for the year in which the benefit was received. Our question here is whether petitioner at a time earlier than December 28, 1945, received economic benefits that were the equivalent in *241 cash to the complete retirement of all of the 153 debentures of petitioner, so that we can conclude as a practical matter that the retirement of the bonds by the corporation took place at an earlier time, thereby terminating the period during which the bonds were held by petitioner. We see no warrant in the record upon which to find receipt of such benefits. The deposits in the agency account were not available to petitioner unless and until the 153 debentures were all surrendered by him on December 28, 1945. In the cases cited by respondent, there was an immediate, unqualified, unconditional benefit conferred, nothing having remained to be done by the taxpayer in order to receive it. The situation here is not unlike that which prevails in cases involving the problem of whether there is receipt of taxable benefits under executory contracts, and such contracts have not been held the equivalent of cash. C. W. Titus, Inc., 33 B.T.A. 928; cf. Harden F. Taylor, 43 B.T.A. 563, 568; affd. (CCA-2), 128 Fed. (2d) 885. An application of respondent's premise in this case would virtually eliminate the difference between the cash and accrual method *242 of accounting, and here petitioner was employing the cash receipts method. It is our opinion that until December 28, 1945, title to the debentures remained in petitioner, and he continued to be the owner of them; cf. McFeely v. Commissioner, 296 U.S. 102; and that petitioner held the particular debentures until that date. Cf. K. E. Merren, 18 B.T.A. 156; affd. (CCA-5), 51 Fed. (2d) 44; Albert E. Dyke, 6 T.C. 1134. [3] He, therefore, derived longterm capital gain upon their retirement, Internal Revenue Code section 117(a)(4). *243 As to the remaining two issues, petitioner does not strenuously contest respondent's position, as the ultimate tax liability is not materially different whether his or respondent's views prevail. On these issues, we believe, however, respondent's approach is correct. The sum of $25,768 paid by petitioner to Campbell & Jordan for the insurance policies cannot be considered as part of the cost of the debentures. Although the acquisition of the debentures and the purchase of the insurance policies were dealt with in one contract, that factor alone does not require nor permit that the amounts paid for the policies be attributed to the cost of the bonds. We believe the two transactions must be treated as separate, as in fact they were. Petitioner's basis for the debentures involved was then $26,562.50, as determined by respondent. The expenses incident to arranging for the retirement of all of the debentures cannot be taken as a deduction in whole in the year when only part of the debentures was retired. Hence, such expenses should be prorated according to the amounts received upon retirement *244 of the debentures. They were selling costs and should be treated as an offset of the amounts received upon the retirement of the securities. Mrs. E.A. Giffin, 19 B.T.A. 1243; Don A. Davis, 4 T.C. 329; affd. (CCA-8), 151 Fed. (2d) 441; certiorari denied, 327 U.S. 783. Decision will be entered under Rule 50. Footnotes
1. See opening statement of Counsel for respondent, Record, p. 11.↩
2. Undoubtedly, one of the commonly employed "income tax-avoiding mechanisms" is the "making and timing of sales of capital assets according to the period held so as to obtain the benefit of the reduced percentages of gain subject to tax". Paul, Studies in Federal Taxation, 19, 21.↩
3. Cf. Special Ruling, [*] 76,173, 1945 P.H., Vol. 5, in which the Commissioner asserted: * * * under section 117 of the Internal Revenue Code, the percentage of gain or loss recognized upon the sale of a capital asset which is to be taken into account in computing net capital gain, net capital loss, and net income, is to be determined according to the length of time the property has been "held". Holding for this purpose has been construed to mean ownership. ( McFeely v. Commissioner (1936), 296 U.S. 102 [36-1 USTC [*] 9008]; Helvering v. Gambrill (1941), 313 U.S. 11↩ [41-1 USTC [*] 9360]. * * *).