Howard Veit v. Commissioner. Laurette Veit v. Commissioner.
Veit v. Commissioner
Docket Nos. 15552, 15553.
United States Tax Court
1949 Tax Ct. Memo LEXIS 50; 8 T.C.M. (CCH) 919; T.C.M. (RIA) 49253; October 11, 1949
Adrian A. Kragen, Esq., for the petitioners. Earl C. Crouter, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined deficiencies of $53,625.03 and $18,539.04 in petitioners' respective income and victory taxes for 1943. Petitioners, husband and wife, contend that he erred (1) by including in the husband's 1942 income the full amount due as compensation for services because by contract the amount was payable in five annual installments beginning in 1943; (2) by treating the compensation as the husband's separate income although the spouses *51 had moved to a community property state when it became payable; (3) by disallowing the deduction of unreimbursed expenses for lodging, subsistence, transportation, communication and entertainment paid by the husband as an employee of the Board of Economic Warfare, and (4) by disallowing the deduction of a loss sustained on the sale of stock. Other assignments of error were abandoned. In respect of the wife the Commissioner made a precautionary determination that the compensation in issue was community in character. Findings of Fact Petitioners, husband and wife, are residents of Pebble Beach, California, and filed separate income tax returns for 1942 and 1943 with the collector of internal revenue for the sixth district of California. Both prepared their returns on a cash basis. The husband (hereafter called petitioner) was employed in 1931 by M. Lowenstein & Sons, Inc., a New York corporation engaged in the business of converting, printing and styling cotton goods. His employment was the subject of a series of contracts, made without specific corporate resolution, by him and Leon Lowenstein, the corporation's president. During 1939 and 1940 he served as executive vice president *52 in charge of sales, production and styling under a two-year agreement dated January 2, 1939. By the provisions of this agreement he was to receive an annual salary of $25,000 and a share of 10 per cent in the corporation's profits for the two-year period, or if losses should be sustained, he was to bear 10 per cent of them but not in excess of $50,000. One-half of the amount computed due as his share of the profits was payable to him by July 1, 1941, and the other half by October 1, 1941. After the corporation had paid him $10,000 on profit account under the agreement, he made with it a second contract on May 16, 1940, whereby it agreed to pay him an extra $15,000 bonus for meritorious service; computed $81,999.93 as his share of 1939 profits, and paid him $1,999.93 thereof, thus leaving $85,000 unpaid. He agreed to settlement on this basis, subject, however, to a reduction in amount if the corporation should sustain losses in 1940. Petitioner had been a resident of Nw York while in the corporation's employ, but in June 1938 he purchased a home at Pebble Beach, California, and on November 30, 1940, he and his wife became legal residents of California. Before the change of residence *53 Leon Lowenstein had urged him to continue in the corporation's employ in a consultative capacity and as supervisor of west coast sales, and on November 1, 1940, he made a contract of employment for 1941 whereby the corporation agreed to pay him a salary of $15,000 a year plus a percentage of the west coast sales and it was agreed further that the balance owed him on account of 1939 profits be paid in installments in 1940 and 1941 and that his share of 1940 profits be paid in quarterly installments in 1942 rather than in 1941, as provided in the contract of January 2, 1939, and bear 1 1/2 per cent interest from October 1, 1941. An agreed deferment in the payment of a share of profits due an employee as compensation had occurred in prior years and was not unusual. On June 18, 1941, petitioner and the corporation signed another instrument wherein they recited that $27,500 was still due for 1939 and payable one-half on September 1, 1941, and one-half on December 1, 1941, and they set forth that petitioner's share of 1940 profits was $87,076.40 and should be payable in equal quarterly installments of $21,769.10 during 1942. The corporation, which kept its books and prepared its tax returns *54 on an accrual basis, deducted the $87,076.40 on its return for 1940. In November 1941 Leon Lowenstein, apprehensive that petitioner might accept employment from a competitor, called him to a conference in New York, and urged him to remain with the corporation in 1942 and 1943 as a consultant and not to accept employment from another. He agreed to do so for a salary of $15,000 a year; was given a bonus of $25,000 - in addition to his $15,000 salary - for services rendered in 1941, and agreed that the $87,076.40, to which he was entitled in quarterly installments during 1942, be paid in five annual installments of $17,415.28 each, with 1 1/2 per cent interest from October 1, 1941, on March 1, 1942, 1943, 1944, 1945 and 1946. The United States entered the war the following month, and because of resulting uncertainties about business petitioner, at Lowenstein's request, consented to accept a nominal salary of $2,500 instead of the $15,000 mentioned at the conference. With this change the parties' agreement was incorporated in a written contract dated December 26, 1941. Deferment of the installment payments on the $87,076.40 profits due petitioner for 1940 was a condition exacted by Lowenstein, *55 who wished to keep the use of the money for the corporation. It was recorded on the corporate books as a liability payable in five annual installments as agreed. The payment provisions of this contract were fully carried out. On March 1, 1942, petitioner received the first installment of $17,415.28, and on March 1, 1943, he received the second installment. On their tax returns for 1942 and 1943 he and his wife included each installment in community gross income, together with his current salary and interest received from the corporation, and each reported half as taxable. In determining petitioner's income and victory tax for 1943, the Commissioner included in petitioner's 1942 income the entire $87,076.40, thereby increasing income in the amount of $69,661.12 above that reported, with the explanation that petitioner had: "* * * received taxable income in 1942 in the amount of $87,076.40 as additional compensation for services rendered in 1940 while you were domiciled in and a resident of the State of New York. * * *" Without eliminating the second installment reported in 1943, the Commissioner, again viewing compensation received from the corporation as not community in character, *56 added to petitioner's income $9,957.64 reported by his wife. As a precautionary measure the Commissioner treated the $87,076.40 as community income in determining the income and victory tax of the wife for 1943, and included one-half, or $43,538.20, in her 1942 income. He made no change in the net income reported by her for 1943. In November 1942 the corporation released petitioner from its service so that he could assist the Board of Economic Warfare in meeting emergencies and difficulties in the procurement of essential materials. He proceeded to Washington, D.C., expecting to serve a few months without compensation and to be reimbursed for his expenses. He was made assistant to the Chief of Purchases; was provided with an office, but after six weeks was informed that the Government would pay him a nominal salary and would not bear the cost of his transportation and his living expenses. He remained in Washington until June 25, 1943, engaged in feverish activity and made many quick emergency trips to various parts of the country in furtherance of the procurement and manufacture of war materials. Because of the urgency of his missions and the speed essential to their accomplishment *57 he was unable to await the issuance of transportation requests or the arrival of government automobiles for local trips, and expended substantial amounts of his own funds for taxis, rail and air transportation. He also paid for his lodgings and subsistence. After one claim for reimbursement was denied because authorization for the trip involved had not been obtained in advance, he made no further claim, and never got any reimbursement. He kept, however, a daily record of his expenditures, which in total figures were as follows: meals, $1,102.90; laundry, $175; hotel rooms, $1,103; valet service, $88.25; entertainment, tips, etc., $318; rail and airplane fares, $603.51; taxi fares, $306.25. All of these expenditures were incurred while petitioner was rendering services to the Board of Economic Warfare. The entertainment of officials, manufacturers and others, and the transportation were in furtherance of that service. Petitioner received from the United States Government a salary of $2,828.63, which he and his wife reported as community income in 1943. During 1942 and 1943 petitioner purchased undeveloped real estate in California for subdivision and sale. He had invented a pocket *58 pipe kit which he was endeavoring to sell and eventually did sell. He maintained at Pebble Beach an office for these ventures. While in Washington, D.C., he expended $472.44 on long distance telephone calls and $67.65 on telegrams to his wife. In these communications he referred to his real estate and invention, and gave his wife instructions. In February 1943 he spent $232.52 on a trip to California to gather data for the preparation of his income tax return. Petitioner and his wife each deducted one-half of $4,600 on their 1943 tax returns as "Living expenses away from home for business purposes." The Commissioner disallowed the deduction. In 1928 petitioner purchased shares of the Beachdale Company for $6,372.88. He gave two-thirds of his holdings to two business associates prior to 1938, and upon merger of the Beachdale Company with the Glasgo Finishing Company in 1939, he received 113 shares of Glasgo common B stock for his remaining Beachdale holdings. In 1943 he sold the 113 shares for $81.36. The Commissioner disallowed a deduction claimed on account of this loss. Opinion 1. Petitioner charges error in respondent's determination that all of the $87,076.40, representing *59 10 per cent of the corporation's 1940 earnings which were payable to him as part of his compensation for 1940 services, should be included in taxable income of 1942. He reported as 1942 income the $17,415.28 installment of such earnings, which he actually received in 1942, and contends that the remaining $69,661.12, payable in four subsequent annual installments, should be taxes when due and received, not added to 1942 income. Respondent defends the addition on the ground that the corporation in 1942 had computed, recognized and recorded the liability; deducted it in full on its 1940 return, and would have paid it in 1942 if petitioner had made demand. By the contract of January 2, 1939, petitioner was entitled to 10 per cent of the corporation's profits for the two years 1939 and 1940 as part of his compensation for services as executive vice president during those two years, and such profits were to be paid half by July 1, 1941, and half by October 1, 1941. Before the end of the two-year period, and on May 16, 1940, petitioner and the corporation made a settlement agreement covering 1939 whereby petitioner received a $15,000 bonus, agreed to $81,999.93 as his share of 1939 profits; *60 acknowledged receipt of $10,000 previously paid on account and received $1,999.93 at that time. There remained $85,000 still payable. On November 1, 1940, petitioner made another contract with the corporation, whereby it was agreed that petitioner would remain in its employ during 1941; that the amount still due under the 1939 settlement agreement be paid in installments in 1940 and 1941 and that petitioner's unascertained share of 1940 profits be paid in four installments during 1942. By these arrangements petitioner received a part of the profits to which he was entitled in advance of July 1, 1941, the first date fixed by the contract of January 2, 1939, and agreed to the deferment of a part to 1942, or after October 1, 1941, the date fixed by that contract for his receipt of the second half. By June 18, 1941, the corporation had ascertained petitioner's share of 1940 profits to be the $87,076.40 here in controversy; and made a supplemental agreement providing that the amount should be paid in four quarterly installments of $21,769.10 during 1942 as contemplated. But in a third employment contract, agreed upon in November and signed on December 26, 1941, petitioner agreed to render *61 services to the corporation during 1942 and 1943; received a $25,000 bonus for 1941, and at the request of the corporation's president agreed further that the $87,076.40 be paid, not in 1942, but in five annual installments of $17,415.28 each, beginning March 1, 1943. Petitioner received payment in this manner, and reported the installment received in 1942 and that received in 1943 as income for those respective years. The Commissioner disregards the deferment as an anticipatory arrangement, and argues that the whole $87,076.40 was unqualifiedly payable and should be all taxes to petitioner in 1942. In a prior notice of deficiency the Commissioner determined that the $87,076.40 was constructively received by petitioner in 1941 and included it in his income for that year. This Court, however, in Howard Veit, 8 T.C. 809, reversed the determination, regarding the agreement of November 1, 1940, whereby payment of petitioner's share of 1940 profits was deferred to 1942, as: "* * * an arm's length business transaction entered into by petitioner and the corporation * * * as mutually profitable to both. * * *" Finding that the agreement was not "a mere subterfuge and sham *62 for the purpose of enabling petitioner to postpone his income tax," we held it effective to defeat a constructive receipt of the amount in 1941. But because petitioner's 1942 tax was not involved, we explicitly refrained from expressing an opinion on the effect of the contract of December 26, 1941. The issue here raised requires that we do so now. Factually the attendant circumstances of the deferments of November 1, 1940, and December 26, 1941, were similar. By each contract the corporation retained petitioner in its employ; by each petitioner procured interest on the amounts due in agreeing to deferred payments and as Leon Lowenstein testified, he, not petitioner, requested the deferments because he wished to retain the money for corporate use. Deferment in the payments of profit percentages due officers as compensation was not new but usual in the corporation's history. Lowenstein and petitioner both testified that each sought his best advantage in making terms, and the record offers no reason to doubt their statements. Petitioner exacted a $15,000 bonus for his 1941 services, and when the United States entered the war after the parties' preliminary negotiations in November, Lowenstein *63 induced him to accept a nominal fixed salary of $2,500 instead of the $15,000 originally contemplated. Respondent stresses that the amount of petitioner's share of 1940 profits had not been ascertained when the contract of November 1, 1940, was made, while on December 26, 1941, it had been computed, credited on the corporate books, and the full amount deducted on the corporation's 1940 tax return. We do not deem these differences material. Under existing contracts there was never a time when the $87,076.40 was unqualifiedly subject to petitioner's demand or withdrawal. He did not voluntarily refrain from collecting money available for him, nor did he agree to the debtor's deferred payment of money available when the agreements were made. For this reason section 29.42-2, Regulations 111; Security First National Bank of Los Angeles, Executor, 28 B.T.A. 289, and other cases cited by respondent have no application. Nor are we impressed by respondent's argument that the corporation's deduction of the amount in 1940 and its payment of interest on the balance are persuasive of petitioner's constructive receipt. The corporation reported income on an accrual basis; petitioner *64 on the cash basis. Hence there was no necessary correspondence between its deduction and his receipt. And as a contract to pay is by its nature not payment to the creditor, Shuster v. Helvering (C.C.A., 2nd Cir.), 121 Fed. (2d) 643, the interest provision is not determinative. We hold that the Commissioner erred in adding to petitioner's 1942 income that part of the $87,076.40 which was payable in future years. Howard Veit, supra; Kay Kimbell, 41 B.T.A. 940. 2. Petitioner assigns as error the Commissioner's determination that the amounts received by him from the corporation in 1942 and 1943 were his separate property and not community property of him and his wife. It is found that petitioner changed his residence from New York to California, a community property state, on November 30, 1940, and in our prior decision we held that the part of the corporation's 1939 profits paid to petitioner in 1941, were his separate property: "Since the right to the additional compensation for 1939 was earned while petitioner was domiciled in and a resident of New York, * * *." The same can be said of his additional compensation for eleven months of 1940. *65 For December 1940, however, he earned the compensation while a resident of California, and as his profit percentage was recognized as compensation for services rendered throughout the year, we hold that one-twelfth of the installments received has a community character. Petitioner contends that as no part of the profit percentage was payable until after the end of 1940, all of it was community, and cites in support a statement of the Circuit Court of Appeals for the Ninth Circuit in Fooshe v. Commissioner, 132 Fed. (2d) 686. "* * * the doctrine of inchoate right, fixing the separate character of such moneys received by the spouse after marriage, upon a contract made before, does not exist in California. * * *" But petitioner's right to compensation was not inchoate. Even although the amount was ascertained in 1940, it was determinable by reference to the corporation's profits, and was "earned" over the course of the year, not at the year's end. 3. On their income and victory tax returns for 1943 petitioner and his wife each deducted half of $4,600 as "Living expenses away from home for business purposes." The Commissioner disallowed the deduction. By amendment *66 to his petition petitioner alleged that while rendering temporary services to the Board of Economic Warfare in 1943 he incurred living, travel, telephone and telegraph expenses for which he was not reimbursed and which he is entitled to deduct. At the hearing he introduced memoranda indicating that he had spent $4,470.52 while stationed in Washington, D.C., for meals, lodgings, transportation, communications and sundries, and in his brief he asks the deduction of this total under four classifications: living expenses in Washington; transportation and entertainment incident to his position with the Board of Economic Warfare; transportation costs of a trip to California to prepare his income tax return, and telephone and telegraph expenses incurred in Washington, D.C., incident to business ventures in California. By section 24 (a) of the Internal Revenue Code personal, living, and family expenses may not be deducted. And while the cost of lodgings, subsistence and travel has been recognized as a business expense deductible by a taxpayer engaged in temporary work away from home, Coburn v. Commissioner (C.C.A., 2nd Cir.), 138 Fed. (2d) 763; Charles G. Gustafson, 3 T.C. 998; *67 Harry F. Schurer, 3 T.C. 544, the subsequent opinion of the Supreme Court in Commissioner v. Flowers, 326 U.S. 465, required a reconsideration of the construction previously given to this section, and such expenses incurred at a taxpayer's post of duty, although distant from his normal home, have been repeatedly denied. Bercaw v. Commissioner (C.C.A., 4th Cir.), 165 Fed. (2d) 521; York v. Commissioner (D.C. App.), 160 Fed. (2d) 385; William W. Todd, 10 T.C. 655; John D. Johnson, 8 T.C. 303; Arnold P. Bark, 6 T.C. 851. Petitioner stresses that his employment was temporary; that he expected it to last only a few weeks or months, and that in fact it lasted only six and a half months. The post of duty for this employment, however, was Washington, D.C., and in like cases involving taxpayers temporarily engaged in war work, unreimbursed living expenses have not been recognized as allowable deductions. Ney v. United States (C.C.A., 8th Cir.), 171 Fed. (2d) 449; Robert F. Green, 12 T.C. 656; William W. Todd, supra.Under these holdings we must deny any deduction *68 for petitioner's living expenses. Petitioner cites Edwin R. Motch, Jr., 11 T.C. 777, as supporting his contention. We there held deductible the unreimbursed expenses of the executive of a machine tool company who rendered technical services to the war effort. He was commissioned as an Army officer, and in the course of his duties bore the cost of operation of his own automobile and of the entertainment of officials and manufacturers. He also incurred travel expenses in excess of the amount for which he was reimbursed. Finding that these expenses were incident to his work, we allowed him to deduct them. Although the testimony and other evidence relating to petitioner's trips and entertainments are of a very general nature, we are convinced from the illustrative examples given that they were incident to his work and necessary to its accomplishment. Perhaps he was technically remiss in failing to use government automobiles, to procure official travel requests and to press for reimbursement. But the record indicates that the delays required by attention to such details would have impeded petitioner's activities, and that his neglect to procure authorizations was prompted *69 by the urgency of his missions as a "trouble shooter." Made under the stress of war emergency such expenses were, in our opinion, ordinary and necessary for the business in which petitioner was engaged, and we hold accordingly that he is entitled to deduct $318 for entertainment, $603.51 for transportation and $306.25 for taxi fares. Edwin R. Motch, Jr., supra.
But the $232.52 expended by him on a trip to California for the preparation of his income tax return, and the cost of telephone calls and telegrams from Washington, D.C., to his home were not incident to his war work. The trip was clearly a personal expense, and while he testified that the communications related to his real estate project or the marketing of his pipe kit invention, he did not establish that either constituted a business in 1943. Cf. Fahs v. Crawford (C.C.A., 5th Cir.), 161 Fed. (2d) 315. The deduction of these expenses is not allowable. 4. On his 1943 return petitioner deducted a capital loss of $3,145.46 on the sale of 113 shares of Glasgo Finishing Company, acquired at a reported cost of $6,372.88 in 1928 and sold for $81.36 in 1943. The Commissioner disallowed this deduction *70 "for lack of substantiation."Petitioner testified that he paid $6,372.88 for shares of the Beachdale Company in 1928, but added that he gave two-thirds of his holdings to business associates so that cost of the remaining third was $2,124.29. In 1939 he exchanged his remaining Beachdale shares for 113 shares of Glasgo common B stock under the terms of an agreement whereby Beachdale was merged with Glasgo Finishing Company under the laws of Connecticut. In 1943 he sold the 113 Glasgo shares for $81.36. Admitting that the evidence establishes facts indicating the loss, respondent suggests rather than argues that "the real loss" occurred prior to 1943 and the sale was made merely for deduction purposes. As the sale was made to a brokerage firm, member of the New York Stock Exchange, as a dealer, and is evidenced by a formal statement from the firm, we perceive no reason to question its genuineness, and accordingly hold that petitioner sustained a loss of $2,042.93 on the sale of stock held by him since 1928. Decisions will be entered under Rule 50.