[Civ. No. 195. Fourth Appellate District.—July 17, 1931.]

In the Matter of the Estate of ROBERTA PAULINE BRUGGEMEYER, Deceased. MANCHA BRUGGE-MEYER, Respondent, v. WALTER G. ZIMMERMAN, Appellant.

Eli F. Bush and John H. Miller for Appellant.

Walter J. Hartzell and Hill, Morgan & Bledsoe for Respondent.

GRIFFIN, J., *pro tem.*—Petitioner and decedent intermarried in Chicago, Illinois, on the eighth day of February, 1912. He had known decedent and lived in her family a greater portion of the time for more than thirty-three years prior to the marriage. They took up their residence in Cali-

fornia on November 1, 1923, and continued to reside in this state until the death of the decedent, which occurred on August 6, 1928. The bulk of the estate in question was accumulated in Illinois. About $20,000 cash in fees was received by petitioner while he was in California, for legal work that he had partially completed before he came to California. He estimated the proportionate value of his services in the two states to be as follows: $15,000 while he lived in California and $5,000 while living in Illinois; that he received from his law practice from 1911 to the date of his wife's death about $79,000 gross. At the time of the marriage the decedent had property of the approximate value of $2,000; $803 of this sum was in the savings department of the American Trust & Savings Bank of Chicago. The petitioner had two pieces of property in Chicago worth from $2,000 to $5,000; a piece of property on Michigan Avenue which in 1912 was worth about $30,000; a law business with modest equipment, and $2,000 in the bank. The decedent, according to the testimony of contestant, operated a hotel of 157 rooms in Chicago from the year 1895 to 1909, which hotel had a gross income of about $50 per day; what the exact net earnings were, was not known to the witness; in 1909, decedent divorced her first husband, paying him the sum of $1,000; that there is but one son living, the contestant herein, the issue of the first marriage; that decedent had an account in an amount unknown, in the Greenbaum Sons Bank in Chicago, prior to 1925.

The items set forth in the inventory and appraisement, claimed by respondent to be community property and by contestant claimed to be the separate property of the deceased, are enumerated as follows: (1) Checking account in the name of Roberta Bruggemeyer, in the First National Bank of Monterey Park, California, $1470.45; (2) a savings account in the name of deceased in the Bank of America of California, Redlands branch, $5,000; (3) a savings account in the name of deceased in the Security First National Bank of Los Angeles, Redlands branch, $39,718.30; (4) a checking account in the name of deceased in the Bank of America, Chicago, Illinois, $623.43; (5) a promissory note dated 7/15/27, payable to deceased, secured by deed of trust on property in Los Angeles County, Ramona Acres (Steele property), $4,713.75; (6) personal effects, jewelry and

clothing, $675; (7) lot 165, Ramona Acres plat, Los Angeles County, $6,000; (8) a contract of sale to Aaron and Anna Rodman, being a portion of lot 165, Ramona Acres, given by Mancha and Roberta Bruggemeyer, which contract of sale was made prior to September 17, 1925, balance due $1568.13; (9) a contract of sale of a portion of lot 165, Ramona Acres, given by Roberta Bruggemeyer, made subsequent to September 17, 1925 (Reid property), $5,200; (10) a contract of sale of a portion of lot 165, given by Mancha Bruggemeyer and Roberta Bruggemeyer, dated prior to September 17, 1925 (Wilkinson property), the unpaid balance being $4,667, the estate's interest therein being $2,338.50; household furniture therein, $500. Petitioner admits item 11, consisting of three $50 Third Liberty bonds, appraised at $150, and item 12 being sixteen $50 Fourth Liberty bonds, appraised at $527.79, to be the separate property of deceased.

Item 1. This item was placed in this bank in the name of the wife, Roberta Bruggemeyer, by petitioner September 17, 1925, it being the earnings of the petitioner, received while he was engaged in the practice of law in Chicago and brought here by him. The reason assigned by petitioner for placing this money in her account at that time was that Mrs. Bruggemeyer had a stroke of paralysis in 1925, that it affected the right side of her head, that she was laboring under the delusion that he, the petitioner, was seeking to get rid of her; that she would be ejected from the house that she was living in and that she was penniless; that to satisfy her peace of mind petitioner took her over to her banker and that at that time he drew a deed and handed it to the banker and at the same time deposited the money mentioned in this item in her name, which he took from a joint account of petitioner and his wife. He further testified that he had no intention of giving her the property or this money for the purpose of creating a separate estate for her; that it was done only to ease her mind and to assure her that he was not neglecting her.

Item 2. This item of $5,000 came from a check drawn by Mrs. Bruggemeyer on the Bank of America in Chicago, Illinois, and was deposited by petitioner to her account in the Bank of America at Redlands, California, January 9, 1928. It was part of a sum of money, to wit, $20,000, that he, the petitioner, placed to her account about May 1, 1925, when they

were both back in Chicago on a business trip after they had moved to California. This particular $20,000 was one-half of the proceeds from the sale of Monarch Refrigerator Company's stock that he had sold a day or two before for $40,000. This stock was purchased by him in July, 1919, when he was president of this company, and paid for out of his earnings. The reason assigned by petitioner for this deposit of funds to her account in Illinois was to the effect that he told her, his wife, he had made this deposit to her account but that he had no intention of making her a gift of it as her separate property, as they never had any separate property and that as they were just coming back to California, it seemed the courteous thing to let her know that "they stood in equal partnership in the same" and "that the money would not always stand in his name". He stated further "that he had practiced that before in a limited way".

Item 3. Petitioner testified that this item of $39,718.30 was wholly his earnings from his law practice and earnings from his real estate in Chicago; that it came in her name under the following conditions: The petitioner and Roberta Bruggemeyer had a joint account in the First National Bank of Los Angeles in the sum of $9,897.48, which was transferred to Roberta Bruggemeyer's account December 5, 1925, and on the same day petitioner transferred from the Bank of America of Illinois the balance of the $20,000, to wit, $15,000, that he had received from the sale of his Monarch Refrigerator Company stock and deposited this in her account. A few days after this he then deposited the proceeds from the sale of two Liberty bonds of his in her account, making a sum total of about $25,500. The interest that accumulated over this period was added to it; no further explanation was made as to the source of the balance in the account. The reason assigned by the petitioner for this transfer was similar to the reasons above stated but adding that on this particular day, and for some days prior, she, Mrs. Bruggemeyer, was in a very bad way (in a sense she was worrying); that he told her that the money he received from that stock he would put in her name so that she would never have anything to worry about. Petitioner further testified that in her (Mrs. Bruggemeyer's) last days, that is the last three years of her life, she had hallucinations, some of which were that he was consorting with other women; that

these other women were polluting petitioner and were robbing her; that she was "broke" and petitioner had all the money; that petitioner was trying to get rid of her; that petitioner's dirty women had been on the porch and that it was too filthy for her to use. Petitioner was compelled to tear out the entire cement porch, steps and brick columns and put in a different colored porch, before she would be willing to sit in the swing on the porch. Petitioner further testified that in the transfer of this account, the deposit of the proceeds of the Liberty bonds, and the transfer of the account from Illinois, he did not at any time intend to make her a gift, or that it should become her separate property or estate; that her condition was so appealing to his own mentality that he was seeking to ease her mind; that he did not believe that he was divesting himself of the money by placing the same in her name instead of either his name or their names.

Item 4. This item, in the sum of $623.43, petitioner testified was accumulated interest from the deposit petitioner made from his funds, the proceeds of the sale of the Monarch Refrigerator Company stock, which was placed in the account of Mrs. Bruggemeyer in May, 1925.

Items 5 and 6. Regarding these items petitioner testified that he purchased the real property, lot 165 of Ramona Acres, in April, 1923, for the sum of $10,500 from his earnings as a lawyer. This money was withdrawn from petitioner's account in the Greenbaum and Sons Bank, now called the Central Trust Company, in Chicago. Title to the real property was held in joint tenancy with petitioner's wife. Houses were built upon it and rented, the money deposited in their joint account, the cost of building being paid from petitioner's $20,000 he received from the sale of his Monarch Refrigerator Company stock. The trust deed was taken back in the name of Mrs. Bruggemeyer for convenience sake only, as he was in the east on business a portion of the time and that he had no intention of giving her the trust deed or the fruits thereof as her separate property.

Items 7, 8 and 9. These items were contracts of sale of a portion of this Ramona Acres executed and delivered under about the same conditions and circumstances as above related, with the express intent that they should not operate

as a gift or be considered to be the separate property of deceased.

All of the title of Mancha Bruggemeyer to the above-described tract was on the seventeenth day of September, 1925, by grant deed conveyed to Roberta P. Bruggemeyer, his wife. Petitioner gives as his reasons for this transfer that Mrs. Bruggemeyer's condition in September of that year was perhaps as bad as at any time in her life; that she was saying that petitioner was trying to get rid of her; that she had no place to go, and that petitioner was going to put her out; that as a result of this petitioner took her to her banker and made the deed of this property to her to satisfy her peace of mind only, and that he had no intention of making a gift of this property to her as her separate estate.

Dr. Sweeney, manager of the Security First National Bank, testified that petitioner transferred the funds to the account of his wife and that there was some conversation about the fact that petitioner wanted her to feel perfectly happy and contented and if she was worried or annoyed about it petitioner would transfer to her name certain sums of money, $10,000 or $15,000 from some other bank, as well as the real property above mentioned.

Dr. John A. Morande, a physician personally acquainted with Mrs. Bruggemeyer, treated her from 1925 until her death. He testified that she had a severe cerebral hemorrhage some time before he saw her in 1925; that he then considered her a mental case; that she had hallucinations and falsely believed that her husband was keeping company with other women; that on one occasion she stated: "Well, I have got him now where I want him,—I have got all this (money and property) in my possession now"; that she seemed to get better after she had been satisfied of the transfer of the property but he did not think she was ever really rational; that he called in a Dr. Bishop, who handles mental cases, and he thought he would have to take her to a sanitarium. Dr. E. J. Eytinge corroborated the testimony of Dr. Morande and petitioner as to her mental and physical condition and as to her peculiar characteristics and hallucinations. He testified that he had often heard petitioner try to make Mrs. Bruggemeyer agree with him that she should eat certain foods and take some medicine or have a nurse, and he would do his

best to argue her into his point of view, but that it never worked.

The evidence discloses that petitioner, within three weeks after the death of deceased, conceived the idea of erecting a monument to the memory of his departed wife and accordingly contracted for and erected a public library and denominated it the ''Bruggemeyer Memorial'' and presented it to the city of Monterey Park, where his wife died; that the expenses were paid from the funds of the estate by the executor, Mancha Bruggemeyer, without an order of court or being directed to do so by the will. That the contestant herein did examine the plans and specifications and take some part in the preparation for the dedication of the library is admitted, but he was not aware of the source from which payment was to be made. The trial court found that the property, real, personal and mixed, that the deceased Roberta Pauline Bruggemeyer may have had at the time of her marriage to petitioner, had been either expended and used up, or had been so commingled with the property acquired by the said Mancha Bruggemeyer and his wife after their marriage that the same can no longer be identified; that all the property standing in the name of Roberta Pauline Bruggemeyer at the time of her death is directly traceable to and was derived from the earnings and efforts of the said Mancha Bruggemeyer excepting some personal effects and Liberty bonds of the total value of about $1500; that, with no intention of making a gift, but solely to counteract the vagaries and hallucinations of deceased, Mancha Bruggemeyer transferred into the name of said Roberta Bruggemeyer all of the property set forth in the inventory except that portion above mentioned, found to be her separate property; that the remaining portion of the property mentioned in the inventory is and was community property; that the expenses of administration, burial and last illness of deceased (without taking into consideration any of the moneys expended on the memorial library) exceeded the value of the separate property of the decedent which was expended for this purpose; that the contestant is only entitled to his share of the separate property and only entitled to question the correctness, validity and propriety of the executor's account in connection therewith; that it is not true that the entire estate of said decedent or any portion thereof was acquired by said

decedent as her separate property in the state of Illinois or that said property came into the state of California impressed with the character of her separate property.

1. Contestant claims that the trial court erred in finding that the property inventoried in the estate was community property, there being no sufficient evidence upon which the trial court could or should have made such a finding.

2. Contestant claims that even if said property should appear to the court to be community property, that one-half thereof has by said testatrix been taken out of the category of community property by the will of said decedent and should be distributed to the contestant under section 1307 of the Civil Code.

3. Contestant further claims that the entire estate of said decedent was acquired by said decedent in the state of Illinois, where the law of community property, so called, does not prevail, and that said property was, in the state of Illinois, the absolute property of said decedent and that said property came to the state of California impressed with the character which it bore in the state of Illinois and is therefore, in California, the separate property of said decedent. Contestant objects to the approval of the final account of executor for the reason that it appears by said account that the executor, without previous authority of court or by specific direction in the will of deceased so to do, he has expended as part of the expenses of administration, to the prejudice of contestant, the sum of $33,294.71 for the purpose of erecting a monument or memorial to the deceased in the form of a public library; that said expenditure is disproportionate to the value of the entire estate, which is appraised at $68,485.33, and asks that said sum be disallowed in said account.

Respondent contends that he is authorized under the general provisions of the law to make such expenditure and that it was and should be a proper charge of administration against the estate; that the contestant is estopped from contesting this item in the account by reason of his participation in the erection of the monument. An executor may erect a monument, such as a pillar, statue, shaft or any other structure placed over a tomb or grave, if the cost of same is reasonable and does not exceed such sum as may, upon a consideration of all of the circumstances, including

the station of the deceased and the value of her estate, be found to be proper and reasonable, but an executor, as such without express authority so to do by will, has no right to erect a public library as a monument to the memory of his deceased wife, donate it to a city and charge the expense of erecting the same to the estate as a part of the funeral expense (*Fancher* v. *Fancher*, 156 Cal. 13 [19 Ann. Cas. 1157, 23 L. R. A. (N. S.) 944, 103 Pac. 206] ; 12 Cal. Jur. 88; *Estate of Weringer*, 100 Cal. 345 [34 Pac. 825].)

■ Independent of objections urged by any person to items in the account of an executor, it is the duty of the court, especially where the item is brought to the attention of the court in settling the account, to carefully scrutinize the same and to reject any improper items therefrom, whether objections are interposed or not. (*Estate of Willey*, 140 Cal. 238 [73 Pac. 998] ; 12 Cal. Jur. 56.)

■ Where a wife makes a will in general terms, disposing of her interest in community property, which property was acquired before the amendment of section 1401 of the Civil Code in 1923, such a testamentary disposition does not destroy the operation of the statute relating to the disposition of community property upon the death of the wife under said section (*McKay* v. *Lauriston*, 204 Cal. 557 [269 Pac. 519]).

Whether the court, under the evidence and the law applicable thereto, can rightfully find that the personal property above designated to be community property, is a question that requires some consideration, in view of the amendment of 1917 to section 164 of the Civil Code of this state and its subsequent amendment in 1923, which subsequent amendment reads as follows: "All other property acquired after marriage by either husband or wife, or both, including real property situated in this state and personal property wherever situated *heretofore or hereafter* acquired while domiciled elsewhere which would not have been the separate property of either if acquired while domiciled in this state is community property, . . . " and the construction the courts have placed on these amendments as to their effect on property brought into this state from another state where the so-called community property law does not exist.

In *Estate of Drishaus*, 199 Cal. 369 [249 Pac. 515], it was held, in so far as the amendment of 1923 was concerned, that

the amendment to section 164 of the Civil Code adding the words *heretofore or hereafter* is not to be given retroactive effect so as to injuriously affect the rights of a husband in respect to his separate property owned and brought to this state in 1916 prior to the adoption of said amendment; and his vested interest in personal property brought to this state in 1916 prior to said amendment and which was his separate property under the laws of a state in which it was acquired is unaffected by said amendment. And at page 371 the court held:

"The effect of the amendment, if valid, would be to render the personal property of the decedent, acquired prior to the taking effect of the amendment and while a resident of the state of Nebraska, community property and as such, subject to the laws of this state declaring the status of husband and wife with relation to the community property during the period of their residence in this state prior to the husband's death. The property of the decedent herein acquired by him in and under the laws of the state of Nebraska prior to the date when he became a resident of California, and having been under the laws of the state of Nebraska his separate property, continued to be such when the decedent became a resident of this state in the year 1916, in conformity with the well-settled rule upon that subject set forth in the following uniform line of decisions: *Kraemer* v. *Kraemer,* 52 Cal. 302; *Estate of Burrows,* 136 Cal. 113 [68 Pac. 488]; *Estate of Niccolls,* 164 Cal. 368 [129 Pac. 278]; *Estate of Warner,* 167 Cal. 686 [140 Pac. 583]; *Estate of Boselly,* 178 Cal. 715 [175 Pac. 4]; *Estate of Arms,* 186 Cal. 554 [199 Pac. 1053]; *Estate of Frees,* 187 Cal. 150 [201 Pac. 112]."

The last case cited has reference to a case wherein a decedent who had acquired certain property in the state of Wisconsin which was separate property under the laws of that state, had subsequently removed to Illinois (which is the state from which some of the funds in the case before us were acquired), and under the laws of which state, also, personal property acquired by a decedent during his marriage would constitute his separate property, and had thereafter, in the year 1910, removed to California, where with his wife he had resided until his death in the year 1920. This court had, therefore, before it the question as to the effect of the amendment to the Civil Code made in the year 1917, as to

whether by reason of said amendment to the code the property had become community property. The court, in determining that question, considered two propositions: (1) As to whether said amendment of the Civil Code made in 1917 (which read in part as follows: "including real property situated in the state and personal property *wherever* situated, acquired while domiciled *elsewhere,* which would not have been the separate property of either if acquired while domiciled in this state") would be constitutional in so far as it was attempted by the legislature thereby to convert the property of the husband which had theretofore been separate property into community property; (2) As to whether the statute of 1917 should or could be given retroactive effect.

In considering these propositions this court held that under the decision of *Spreckels* v. *Spreckels,* 116 Cal. 339 [58 Am. St. Rep. 170, 36 L. R. A. 497, 48 Pac. 228], the amendments to sections 164, 172 and 172a of the Civil Code adopted in 1917 were not to be given retroactive effect so as to injuriously affect the vested rights of the husband in respect to his separate property owned by him prior to said amendment to the code. So may it be said of the amendment of 1923 amending section 164 of the Civil Code, in so far as it applies to property acquired before, and the character of the property determined prior to the adoption of the amendment. Whether all of the money which was brought to California was accumulated in Illinois by decedent before or after the adoption of this amendment in 1917 is not clear from the evidence before us. The trial court has found it to be community property. (If this amendment of 1917 is valid and does apply, then practically all of said personal property brought into the state by the petitioner would have been community property.) If said law is not valid and does not apply practically the entire balance, being the earnings of petitioner acquired in the state of Illinois and standing in his name, would be his separate property when brought here.

Adopting either view of it, contestant herein would not be benefited, nor would he be entitled to participate in the proceeds of the estate unless petitioner, by his subsequent act, had made a gift of this property to his wife and by reason thereof it became her separate property.

■ It is true that section 164 of the Civil Code reads: "But whenever any property is conveyed to a married woman *by an instrument in writing* the presumption is that the title is thereby vested in her as her separate property and in case the conveyance is to such married woman and to her husband or to her and any other person, the presumption is that the married woman takes the part conveyed to her as tenant in common unless a different intention is expressed in the instrument, and the presumption in this section mentioned is conclusive in favor of a purchaser or incumbrancer in good faith and for a valuable consideration."

The presumption herein referred to is a disputable presumption and may be overcome by competent evidence. (*Vandevort* v. *Godfrey*, 58 Cal. App. 578 [208 Pac. 1017].)

In *Bare* v. *Parker*, 51 Cal. App. 106, 108 [196 Pac. 280], the court said: "In affairs matrimonial such as this, men are often moved to action by the prompting of emotion or sentiment or even by considerations of domestic policy. To relate all the operating causes that influenced human conduct long after the passing of the occasion with varying attending circumstances is quite difficult for the average person. The rigid rules of logic properly applied in an effort to explain conduct in ordinary business transactions are often unsatisfactory aids in divining motives that may have influenced matrimonial conduct. For this reason, all other things being equal, careful consideration must be given to the testimony of the survivor of the marriage who perhaps alone has knowledge of the secret understanding of the marital purposes and intentions. The credibility of the witness, however, is subject to the test of the general rules of evidence. It has been held that title placed in the wife's name with no intention of making a gift to her of the property, but merely for the purpose of pleasing her, is sufficient to rebut the presumption prescribed by section 164 of the Civil Code." (Citing *Fulkerson* v. *Stiles*, 156 Cal. 703 [26 L. R. A. (N. S.) 181, 105 Pac. 966].)

The trial court found that the transfer of all of the property above mentioned was not intended as a gift. We believe that the evidence amply justifies this finding. (*Fanning* v. *Green*, 156 Cal. 279 [104 Pac. 308]; *Estate of Jolly*, 196 Cal. 547 [238 Pac. 353]; *Estate of Nickson*, 187 Cal. 603 [203 Pac. 106].)

■ The evidence establishes as a fact that there was the item of about $20,000 in money which was received through the sale of petitioner's stock and was placed to the account of the wife not as a gift, but under conditions as heretofore related, after petitioner and his wife became residents of the state of California.

Respondent relies upon section 946 of the Civil Code, which provides that "If there is no law to the contrary in the place where personal property is situated, it is deemed to follow the person of its owner and is governed by the law of his domicile", and that independently of the statute of 1917, personal property in Illinois acquired by a married man, by his efforts, should be treated as community property where he was domiciled in California at the time of its acquisition and *vice versa*. (5 Cal. Jur., sec. 6, p. 280, and cases cited.) We find that the trial court has found adversely to respondent, defeating his contention, that the property was acquired while petitioner and his wife were residents of the state of California and therefore was community. It held that deceased never acquired the money as her separate estate as a gift from her husband, therefore it remained the separate property of the husband under the law of the state of Illinois; he acquired it through the sale of his stock, which said stock was acquired by him during the month of July, 1919, by his private earnings while residing in Illinois.

We are of the opinion that the evidence in this case establishes as a fact beyond dispute that the bulk of the property above listed and ordered distributed in the decree of distribution was the separate property of the husband and is directly traceable to his earnings in Illinois, which were brought to this state by him.

■ Under the laws of the state of Illinois, *Estate of Arms*, 186 Cal. 554, at page 563 [199 Pac. 1053], all of this property acquired in the state of Illinois would have been the separate property of the husband, when brought to this state and would remain such, notwithstanding the provisions of section 164 of the Civil Code as amended in 1917 (Stats. 1917, p. 827), and its subsequent amendment in 1923 (Stats. 1923, p. 746). In so far as said amendments attempt to change the character of personal property acquired by either husband or wife, or both, while domiciled in another state, when by the laws of the other state it would be their separate

property, said amendments are ineffectual and do not convert that particular property into community property when subsequently brought to this state, and when the owner becomes a resident of California.

We are of the opinion that the authorities above cited sufficiently justify the reasons for this holding without restatement of them at length in this decision.

Therefore, the finding of the trial court that all of the property above mentioned was the community property of petitioner and the deceased must be reversed to exclude from consideration in the probate proceedings of the deceased wife's estate such portions of the property as is the petitioner's separate property, it being no part of the estate and not subject to distribution thereunder. There is ample evidence to support the finding that the property above mentioned was and is not the separate property of the deceased.

Therefore, the decree of distribution is reversed and the case remanded for appropriate proceedings. That portion of the order of the trial court approving and settling the final account allowing the item of $33,294.71 as a proper charge against the estate is reversed.

Barnard, P. J., and Marks, J., concurred.