[Civ. No. 21108. Second Dist., Div. Two. July 18, 1956.]

RICHARD DARNOLD, Respondent, v. STANLEY H. VOGES et al., Appellants.

236

Gibson, Dunn & Crutcher, Norman S. Sterry, Ira C. Powers, Sherman Welpton, Jr., Glenn Warner and Martin E. Whelan, Jr., for Appellants.

Robertson, Harney, Drummond & Dorsey, David M. Harney and Vernon W. Hunt, Jr., for Respondent.

MOORE, P. J.—Defendants demand the reversal of a judgment for damages allegedly resulting from personal injuries suffered when a cow kicked and fell upon plaintiff. They contend (1) the judgment is without evidentiary support; (2) prejudical errors were made in rulings upon the admissibility of certain evidence; (3) certain instructions were prejudicial.

The Voges brothers, appellants, operated a dairy farm

under the name of Inglewood Farms,[1] near Torrance, where they processed milk purchased from divers milk producers. The elaborate processing plant included a barn which appellants had leased to John Bos. He owned a herd of some 300 milch cows which he caused to be milked in the barn. He had agreed with appellants "that they could take visitors around." Pursuant to such agreement, appellants had thousands of school children coming to visit the dairy to see the bottling and processing of "the complete dairy farm" and university girls about to become teachers came to learn something of the dairy industry. In all, about 7,500 visitors were shown by appellants annually through the dairy. So secure was the right of appellants to use the barn for their purposes that they "built a cement step-up all the way down the side of the barn" so that they could get about "95 children up there at one time to watch the milking processing."

Among appellants' visitors were some spastic children which appellants brought inside the barn in their wheel chairs right next to the cows. Also, at times, appellants took their visitors "down the feed aisle when the cows were in there being fed and milked." From the foregoing it is clear that the jury were warranted in finding that appellants were unrestrained in their use of the barn and its passageway from which photographs were taken. Not only did appellants come and go as visitors through the barn as it pleased them, but they made use of their privilege by inviting such parties as would serve their own purposes into the barn.

In order to stimulate a wider interest in their business, appellants contracted with the Torrance Herald to advertise the business of Inglewood Farms. In turn the Herald engaged one Hartford to obtain an advertisement from appellants. Having procured a contract for the publication of such advertisement, Hartford had the Herald's photographer, one Svensk, accompany him to Inglewood Farms, October 31, 1952. On that day, Bos had employed respondent as a milker. At the time of the accident, he was engaged in milking his employer's cows by the use of a mechanical device. As he sat on a stool nine inches high reaching under cow number 3 to attach a milking machine to her, a flashlight bulb flashed nearby, whereupon cow number 2 whose head was in a stanchion pulled back violently and in a moment had crushed respondent to the floor. On crawling out, re-

---

[1]Subsequently incorporated.

spondent called to photographer Svensk to inquire who gave him permission to enter the barn and take pictures. His reply was that the foreman (of appellants) had done so. Respondent suffered serious injuries for which the jury returned a verdict for $72,813.90. The motion for a new trial was denied on condition that the sum of $25,000 be remitted from the verdict.

On their arrival at the Farms, Hartford introduced Svensk to Stanley Voges who introduced Svensk to Mr. Barnard, appellants' technologist and plant manager; also, he advised Stanley of his desire to take photographs of "anything of interest." Having taken a number of pictures of the Farms, Svensk said they would be pleased to get photographs of the actual milking. Barnard replied that permission to do so would have to be obtained from Bos, since he was lessee of the barn and in control. Appellants now say that "the record was conclusive that it was under Bos' complete control," and thereby seek to avoid responsibility for the acts of Svensk. But the jury could reasonably have determined that by virtue of the agreement with Bos for appellants to bring visitors into the barn, Barnard as superintendent for appellants had led the photographer into the barn and told him he now had permission to take pictures of the actual milking. After Barnard left the scene, Svensk took two flashlight pictures of cows being milked. At that time the bovines stood so that their bodies were 2½ feet apart with their necks in stanchions. It was at the time of such photography that respondent was injured by cow number 2.

By reason of the agreement that appellants might freely conduct visitors through the barn and of their having generously exercised such privilege, the jury were warranted in making their implied finding that appellants had invited Svensk into the barn and had caused him to flash the light in the faces of the cows. Also, such finding was supported by Bos' emphatic testimony that neither he nor his agent had consented to anyone's taking pictures in that area.

Mr. Barnard testified that neither he nor anyone in appellants' office was authorized to permit pictures to be taken in the barn. But the jury were justified in rejecting Barnard's testimony so far as authority from appellant is concerned for the reason that Hartford and Svensk had come to the plant for the purpose of taking pictures to be used for the benefit of appellants' business; not that of Bos. They were to be published in the Torrance Herald. The

contention that they were there on their own business and not for the benefit of Inglewood Farms is to disregard the implied finding that they were there with appellants' permission to take the photographs, if, indeed, they were not present on the invitation of appellants. The advertisement was not to benefit Bos or his herd. Moreover, when Hartford and Svensk arrived at Inglewood Farms, they were greeted by Stanley Voges who left them with Barnard, the Inglewood Farms' foreman. The latter "paved our way for all pictures," testified Hartford, and accompanied the two men as they photographed a number of scenes. Having been placed in Barnard's charge, they asked him and he told them what views might be taken. After cows 2 and 3 had been photographed, respondent inquired of Svensk who gave "him permission to take a picture in there." The only reply was: "The foreman, the foreman." Since Svensk had met only Stanley Voges and Barnard and since the milkers had no foreman, it must be conceded that the jury were correct in finding that Barnard, foreman of Inglewood Farms, gave Svensk permission to photograph cows 2 and 3 and that he was authorized by appellants to do so.

In doing any act that might disturb a herd or a single bovine, the person to be consulted is he who is close at hand and likely to be affected. Because a man is engaged in the performance of a menial task is not a valid excuse for ignoring him when danger lurks in the offing. He is still an individual whose personality demands respect and protection against potential dangers. Insofar as his rights to be protected against latent perils are involved, every man is a king. But Darnold was ignored by Svensk and by Barnard. ██ While the latter disclaimed having authority to permit pictures to be taken of the cows, and Bos denied having been requested to allow them to be photographed, the glaring facts remain that respondent heard nothing prior to the flash, Barnard was in charge of the photographers in the plant for the occasion and Svensk answered respondent that permission had been given by "the foreman." It is true that Barnard testified he had called out requesting the milkers to cooperate; that he knew all four milkers, but had heard no response and never identified a milker as having consented, but Mr. Hartford testified that he heard no statement of Barnard that it was necessary to get the permission of the milkers; nor did Barnard make request of anyone in the barn to consent to photographing the cows. The evidence is sufficient to justify

a finding that appellants did not have the consent of respondent to light a flash bulb before the cows where he was in pursuit of his duties and that neither appellants nor the photographer warned respondent of the latter's immediate intention. The jury were not obliged to determine that because Bos testified that he had exclusive control of the barn or because Barnard testified to lessors' lack of authority to permit photographing in the barn, appellants were not the authors of respondent's injuries.

Appellants make a powerful argument to the effect that the accident described by plaintiff did not occur because it could not happen. However, the testimony of plaintiff, of Stanley Voges and Virgil Lindsay, Jr., contain passages which, added to the jurors' combined experience with the common facts of life (*Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal.2d 480, 501 [55 P.2d 870] ; *People* v. *Miller,* 41 Cal.App.2d 252, 258 [106 P.2d 239] ; *Miller* v. *City of Arcadia,* 121 Cal. App. 660, 662 [9 P.2d 587] ; *Cederberg* v. *Robison,* 100 Cal. 93, 96-97 [34 P. 625]) rule out appellants' claim that the evidence was inherently improbable. To meet that test "there must exist either a physical impossibility that they [facts stated by witness] are true, or their falsity must be apparent without resorting to inferences or deductions." (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].)
 The same case continues : "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (*Hicks* v. *Ocean Shore Railroad, Inc.,* 18 Cal.2d 773, 781 [117 P.2d 850].)" The instant record presents a question of fact which the jurors and trial judge resolved in plaintiff's favor. We must accept as established his version of the accident and resultant injuries.
 It is fundamental that all persons are required to use ordinary care to avoid injuring others. Such care is that of an ordinarily prudent person reasonably required under the circumstances of a given case. The amount of such care must be according to the danger that might reasonably be anticipated. (*Hilyar* v. *Union Ice Co.,* 45 Cal.2d 30, 37 [286 P.2d 21].) Everyone is bound without contract to abstain from injuring the person of another or of infringing upon his rights. (Civ. Code, § 1708.)
 The jury were justified in concluding that appellants

did not exercise the care expected of a reasonably prudent man under the circumstances, to avoid creating a foreseeable risk of harm to respondent. They must have known that to send a photographer into the cow barn at feeding time, suddenly to flash the brilliant light of a photographic bulb in the face of a milch cow is calculated to excite her or some of the herd and cause them to pull and jerk their stanchions, to kick, push or fall against any object near. They knew four milkers were at work among the 60 cows; that one or all of them might be under a 1200-pound animal and that a sudden fright might result in the trampling of the milker. They knew, also, there was no urgent necessity of either a public or private nature requiring such speed in the photographing of the cows as would not allow a moment's delay to call the milkers out. Because appellants were exercising their privilege of permitting strangers to enter the barn and because the photographers were their guests, they owed it to respondent to exercise reasonable care to see that neither respondent nor any other milker should incur the risk of injury. Inasmuch as whether reasonable care was exercised and whether the amount of such care required by the situation was exercised were factual issues fairly determined by the jury, that determination cannot be upset by an appellate court. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].) That finding is supported in reason: Knowing there was, at least, doubt about the propriety and safety of their project, appellants could readily have called to respondent to gain his cooperation. Not so with appellants. They "paved the way" for Hartford and Svensk who naturally concluded that arrangements had been made by the "head man." Their only admonition to the photographers was "not to scare the cows," knowing at that very moment that Svensk was armed with a device that might cause more terror to the bovines than would a battering ram against the barn. Appellants made no attempt to ascertain whether the milkers had notice of the pending explosion of the flash bulb. Having no reason to anticipate the event, respondent had no opportunity to avoid it.

 Not only did appellants owe a general duty to respondent, but, also by virtue of the fact that appellants conducted the photographers into the barn and onto the passageway to take the pictures, and since they were there as licensees merely, they owed a special duty to all persons lawfully there to avoid injuring them by the exercise of the amount of care reasonably necessary to effect such purpose. But they did no

such thing. They made no attempt to warn respondent of his danger. By reason of the premises, appellants breached their duty to respondent as a proximate result of which the latter sustained injuries to his damage. Since both court and jury determined that appellants failed to act as reasonably prudent persons, they have no escape from the judgment on the basis of not having breached their duty to respondent.

One who can foresee harm from his failure to exercise reasonable care must pay for the consequences of his negligence. (*Richardson* v. *Ham,* 44 Cal.2d 772, 776 [285 P.2d 269].)

Furthermore, the duty of appellants to control the movements of Svensk is clearly established. He was their special guest. He gave no indication that he was there in any other capacity while the fact that appellants sent him into the barn to take the pictures was clearly established. Whether the Torrance Herald was an independent contractor is not of vital consequence. Its man Svensk was in the barn at the instance of appellants and did as he was told by them. That he did not call respondent from his place beside the cow was witnessed by appellants who according to their own testimony asked respondent's permission to take the pictures, but which the jury found to be false.

### APPELLANTS' BREACH OF DUTY

Appellants contend lustily that they breached no duty to Bos or his employees in entering the barn. Such a breach is not at issue. Respondent raised no such question. It is immaterial whether Bos gave permission. He was not a milker and could not have suffered deteriment by the movements of his cows. The breach that caused the damage was the breach of duty due respondent and his fellow milkers. The jury found no permission had been given by respondent to make flashlights in the face of the cow that injured him. It is contended that Barnard was a licensee and could not be liable for doing the act he was licensed to do so long as he was free from negligence, citing *Defense Supplies Corp.* v. *Lawrence Warehouse Co.,* 67 F.Supp. 16, 20. But that decision is not pertinent. It involves an act of a licensee that was not negligent. The duty in the instant matter was the duty appellants owed respondent. He was the individual in a place of danger.

To evade their responsibility, appellants have argued in their briefs and orally that respondent could not possibly have been injured by the cow; that his stool was "strapped to his

loin''; that it was not damaged; that the milk taken from cow 3 was in a seven-gallon bucket and was not spilled; that he decided it was an opportune time to ''pretend an accident had occurred so he could get more medical care''; that ''appellants had no notice of any such claim until suit was filed a year later.''

Also, they paraded before the jury that he had suffered an industrial injury in Oregon and all the complaints he now makes are only hangovers from that injury and that he became dissatisfied with his award in the north and used a pretended injury at Inglewood Farms to increase his income. The facts concerning such matters were cleverly presented to the jury and the asserted vice of respondent's claims was so emphasized that appellants' contentions could hardly have been misunderstood. The jury weighed all the evidence and determined that respondent's cause was just; that appellants were negligent; that respondent was injured and suffered damages.

In view of *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689], on what theory may an appellate court disturb the verdict which was studiously considered and cautiously modified by the trial judge? It is the rule of reviewing courts when the sufficiency of the evidence is in question to resolve all conflicts in favor of respondent and to indulge every reasonable inference to uphold the verdict. When it appears that a verdict, attacked as unsupported, is founded on any substantial evidence which will support the jury's conclusion, the appellate court has no power to disturb the judgment. (*Estate of Bristol, supra.*) Such rule is emphasized where, on motion for a new trial, the judge has considered all issues presented to the jury, and sustains their finding.

## ANTICIPATE A COW'S EMOTIONAL UPSET?

Appellants appear amazed at the implied finding that it was reasonable to anticipate a distressful reaction by a cow in the event of a sudden flashlight in her face or that it is reasonable to foresee that the cow would probably be frightened by an unexpected flash in the homey environment of a cow barn. Whether it was reasonable to anticipate such a reaction, whether in the exercise of ordinary care, appellants should have known that a cow on the explosion of a flash bulb in her face would have reacted violently to the phenomenon is not a question of law, but one of fact to be determined by the jury who had to consider all the circumstances

of the event. Who knows what the behavior of a brute will be? Some are placid and not disturbed when a red rag is waved before their eyes, some are vengeful and ferocious. Some might not be resentful if brought by degrees to an acquaintance with a flash bulb while others are excited and upset when a light is suddenly flashed. A person who approaches a cow at feed time for the purpose of flashing a bright light or of discharging a gun cannot be excused for his negligence merely because he did not know for a certainty that the bovine would resist the sudden light or noise. As men of experience in dealing with livestock, appellants knew or should have known that the cows might be startled and might attempt to escape from their stanchions. A single, simple rule for all situations cannot be declared with safety. A jury knows that there are many animals that out of a herd of 60 cows, some of them might react violently when frightened and that only ordinary prudence would suggest the exercise of caution where the safety of a human being is at stake.

The milch cows of Mr. Bos were large animals weighing about 1,200 pounds. Each had her head fastened in a stanchion. She could move it vertically about 3 feet. Her body was about 2½ feet from her neighbor on each side, providing space for the milker to enter with the machine. Appellants and their foreman knew that each cow could not only pull back, kick, move from left to right, but could lie down. In that space she had room to move her body with force and rise high enough to throw it against and upon a person. Respondent with 20 years' experience with milch cows testified that a flashlight in the immediate presence of a cow will excite her. He had witnessed such an event in the barn of appellants only two months previously. Also, Barnard knew cows were subject to fright from sudden movements and warned the photographers not to ''scare'' the cows. So profound was the conviction of Bos that strangers would disturb his herd, he allowed them to enter upon condition that they *not* scare his cows. Moreover, Stanley Voges testified that cows are ''touchy''; that ''violent or sudden noise will cause a panic among cows; that cows are so subject to fright from the unexpected that one may even kick her own milker when he comes up unexpectedly''; that he had seen cows go down on their knees at a sudden, unexpected flash of light. Witness Lindsay testified a scared cow may kick, go down on her knees and roll on the milker.

Cletus Howard, a milker, had seen cows jump in the barn with both rear feet off the ground.

Appellants contend that by reason of the reputation of the cows of Mr. Bos for kindly conduct, they had the right to assume that no violent reaction of any of them would occur after the flashing of a photographic bulb and therefore no one could have been negligent in the photographing of the cows in the barn. They cite as precedents: *O'Brien* v. *Gateway Stables,* 104 Cal.App.2d 317 [231 P.2d 524]; *Finney* v. *Curtis,* 78 Cal. 498, 501 [21 P. 120]; *Clowdis* v. *Fresno Flume & Irr. Co.,* 118 Cal. 315 [50 P. 373, 62 Am.St.Rep. 238]; *Schnell* v. *Howitt,* 158 Ore. 586 [76 P.2d 1130]; *Barnett* v. *Pulda,* 116 N.J.L. 141 [182 A. 879].) They declare that "the O'Brien case is so factually indistinguishable from the instant case" etc., upon the strength of it and their cited decisions, the action at bar should be reversed.

Let us see: The father of appellant in the O'Brien case had for many years maintained a boarding stable and kept two riding horses for rent. One was a mare, by name Roxan, a spirited animal but gentle and quiet; she had never reared up, run sideways or pitched, and had no bad habits. The appellant invited the plaintiff for a horseback ride before dinner at his parents' home. In the ride, Roxan cantered, galloped, and for no apparent cause turned right and left and threw Miss O'Brien to the ground. She sued, charging negligence in allowing her to ride the "blooded and spirited mare." Because the trial court had found that Roxan was not vicious, but was a normal, gentle riding animal, and that appellant did not have any reason to believe that she was dangerous or of refractory propensities, and had found that appellant was not negligent in permitting Miss O'Brien to ride her, we concluded that an award of damages was unjust, and reversed the judgment. The difference between the mare and cow number 2 lies in the fact that Roxan was an intelligent animal of a species whose members are readily habituated to the ways of man. They love their human companions and happily bear their burdens. Roxan had worked at her trade for many years, had never been known to be vicious, wild or intemperate, but had gained a reputation at Gateway Stables for being docile, kind, and amenable. Because she had not been known in six years of riding to run away or pitch, kick, bite or indulge in any equine vices, appellant had no reason to anticipate that she would run away and throw the young lady to the ground. We have

in the instant action no such animal. While Roxan was a highly intelligent quadruped, cow number 2 was merely a dumb brute. Her dinner had not been daily attended by a flashlight exploded by a stranger, hence she could not have gained a reputation for silence and inaction in the presence of such phenomena. Since she had not become inured to their effect, no one could have been certain that she would calmly stand in their presence. Appellants knew too much not to suspect her resistance to a suddenly brilliant flash. While Miss O'Brien's saddle mare had repeated daily her kindness, patience and gentleness as a beast of burden over a long period, cow 2 had presumably done nothing but march back and forth to and from the barn with no knowledge gained of her except the amounts of her daily consumption and her gift of milk and calves. No regular tests of her reactions to a flash bulb had evidently been made. She had no good reputation for any like or dislike for a flashlight in her face.

Unless an animal has established a reputation for phlegmatic behavior in the sudden appearance of an unusual spectacle, its unpredictability is assumed by reasonably prudent men. A quiet, gentle horse had a searchlight thrown upon him. He ran away and caused damage to the plaintiff. Contrary to the defense of nonforeseeability, the defendant was held to have been negligent. (*Maiss* v. *Metropolitan Amusement Assn.*, 241 Ill. 177 [89 N.E. 268].) Where a team of mules became unduly excited by the driver, causing the passenger to fall off and be killed, it was held that the accident was due to the negligence of defendant's driver. (*Dover* v. *Mayes Mfg. Co.*, 157 N.C. 324 [72 S.E. 1067, 46 L.R.A.N.S. 199].) See where a whistle frightened a horse (*City of Winona* v. *Botzet*, 169 F. 321 [94 C.C.A. 563, L.R.A.N.S. 204]); a horse was suddenly slapped on the back (*Casey* v. *Sawyer Biscuit Co.*, 163 Ill.App. 145); a canvas flapped (*Buchanan* v. *Hurd Creamery*, 215 Iowa 415 [246 N.W. 41, 45].) In the Buchanan case, the court observed that some animals react one way, while others react a contrary way; that therefore a person is not warranted in assuming that his own animal will not be frightened. But it is the law that the question as to whether a certain phenomenon should have tended to frighten an animal is for the jury. (*Tanner* v. *Culpeper Const. Co.*, 117 Va. 154 [83 S.E. 1052, Ann.Cas. 1917E 794]; *Crouter* v. *City of New York*, 130 App. Div. 873 [114 N.Y.S. 353].) Also, whether an event was

foreseeable and whether it was the proximate cause of the injury are factual issues. (*Jones* v. *City of South San Francisco*, 96 Cal.App.2d 427, 435 [216 P.2d 25].) In the instant controversy, the jury determined such issues against appellants.

Appellants complain of error in instructing the jury that plaintiff, as an employee of Bos, was an invitee of defendants,[2] and following it with BAJI 213C[3] concerning the duty of invitor to invitee. These instructions were erroneous. The first one invaded the province of the jury. It assumed and impliedly asserted that defendants and Bos had joint control of the barn, which at best was a fact question for the jurors. Instruction 213C proceeds upon the faulty basis laid by the preceding instruction and defines rights and duties of the parties upon that erroneous premise. But certain other considerations must be examined in order to determine whether the error is so prejudicial as to require a reversal.

The evidence establishes that Barnard took the photographers to the Bos barn; that he had no authority from

---

[2]*Foster* v. *A. P. Jacobs & Associates*, 85 Cal.App.2d 746 [193 P.2d 971].

Plaintiff, as an employee of John Bos, was a business invitee of Stanley H. Voges, Raleigh A. Voges and Ralph C. Voges, doing business as Inglewood Farms, and these defendants owed to plaintiff the duty owed to a business invitee, as will be more fully explained in the following instructions.

(Requested by Plaintiff)

(Given)

[3]BOOK APPROVED JURY INSTRUCTIONS: 213C

Toward an invitee, he who extended the invitation, express or implied, is obliged to refrain from active negligence and to exercise ordinary care to keep the premises in a condition reasonably safe for the invitee.

But the responsibility of one having control of the premises is not absolute; it is not that of an insurer. If there is danger attending upon the entry, or upon the work which the invitee is to do on the premises, and if such danger arises from conditions not readily apparent to the senses, and if the owner has actual knowledge of them, or if they are discoverable by him in the exercise of ordinary care, it is his duty to give reasonable warning of such danger to the invitee. The owner is entitled to assume that the invitee will perceive that which would be obvious to him upon the ordinary use of his own senses. In brief, there is no duty to give the invitee notice of an obvious danger.

In the absence of appearances that caution him, or would caution a reasonably prudent person in like position, to the contrary, the invitee has a right to assume that the premises he was invited to enter are reasonably safe for the purposes for which the invitation was extended, and to act on that assumption.

(Requested by Plaintiff. Given modified as above.)

Bos to permit them to take flashlight pictures inside; that Bos was away at the time; that no one had been delegated the authority to act for him in his absence; that there were four milkers in the barn when Barnard and the photographers arrived; that Barnard made no effort to learn where they were at the time. The evidence warrants the inference, contrary to his testimony, that Barnard did not seek or obtain consent of any of the milkers to the taking of flashlight or any other pictures. Plaintiff heard no such request and gave no consent; and there was no one there acting for him. Svensk said that Barnard asked someone in the barn whether he could take pictures, etc., but he heard no response; Barnard himself was vague about the kind of response or responses he received. Although Barnard did not have the right so far as Bos was concerned to authorize the taking of flashlight pictures in the barn and got no consent thereto (as the jury impliedly found) he did tell Svensk he could go ahead. He, Barnard, as foreman of appellants, was thus in the position of one who voluntarily undertakes to perform an act pregnant with danger to others. He must exercise reasonable care (*Perry* v. *D. J. & T. Sullivan, Inc.*, 219 Cal. 384, 390 [26 P.2d 485]; Prosser on Torts (2d ed.) pp. 186, 476; 65 C.J.S. § 4(b), p. 343); and that includes reasonable foresight as to harmful consequences of his acts (*Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 216-217 [157 P.2d 372, 158 A.L.R. 872]; *Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 234 [282 P.2d 69]; *Signorelli* v. *Potter*, 43 Cal.2d 541, 544-545 [275 P.2d 449]; *De Mirjian* v. *Ideal Heating Corp.*, 129 Cal.App.2d 758, 772-773 [278 P.2d 114]). It is apparent that the question of whether Barnard did or did not have authority to tell Svensk to proceed with the flashlights becomes immaterial, as does the question of whether Svensk was technically an agent of defendants. When Barnard undertook to act, he was required to act prudently, to exercise that degree of foresight which a reasonably prudent man would display in the same circumstances. The question of foreseeability of harm is ordinarily one of fact (*Mosley* v. *Arden Farms Co., supra*, 26 Cal.2d 213), and that was true in this instance. The question of what cows do or do not do in given circumstances is one for the jury, not the reviewing court (authorities, *supra*).

 That question of foreseeability of the conduct of milch cows proved to be the crucial issue, but it was not made clear to the jurors. BAJI 213C, footnote, *supra,* was

the closest approach. Defendants did not request any instruction on the subject and do not complain of failure to give one. They do assert error in giving 213C, however. It was not actually prejudicial. Upon the assumption that plaintiff was an invitee of defendants, it defined their duties as invitors toward him. The words "invitor" and "invitee" were not defined for the jurors, but they were told that plaintiff was defendants' invitee and as such entitled to protection against active negligence on defendants' part. References in the instruction to safe condition of the premises probably meant to the jurors, struggling to understand and apply it to the facts at bar, nothing more than legal mumbo jumbo. But, as stated, the instruction says that defendants (through Barnard) owed plaintiff a duty to refrain from active negligence and that "if such danger arises from conditions not readily apparent to the senses, and if the owner has actual knowledge of them, or if they are discoverable by him in the exercise of ordinary care, it is his duty to give reasonable warning of such danger to the invitee." As applied to the facts in hand, this was another way of saying that defendants must foresee and guard against danger to plaintiff which a reasonably prudent man would recognize and protect against. That is the essence of the controlling issue in this case. Appellants cannot complain of lack of clarity or precision in the instruction because they did not propose any proper qualifying or clarifying instruction. (*Colgrove* v. *Lompoc Model "T" Club, Inc.*, 51 Cal.App.2d 18, 24 [124 P.2d 128] ; *Tabata* v. *Murane*, 24 Cal.2d 221, 228 [148 P.2d 605].) It cannot be said that in the absence of the error in this instruction, a different verdict would have been probable. (Code Civ. Proc., § 475; *Treu* v. *Kirkwood*, 42 Cal.2d 602, 607 [268 P.2d 482] ; *Gilbert* v. *Pessin Grocery Co.*, 132 Cal.App.2d 212, 227 [282 P.2d 148].)

In concluding this phase of the discussion, it might with propriety be observed that where the instructions as a whole substantially and correctly cover the law applicable to the controversy, the judgment will not be reversed notwithstanding some technical but harmless errors found in the court's charge.

### The Injuries

For the injuries suffered by respondent, the jury assessed his damages at $72,813.90. That they were serious there is no doubt. Three physicians, each a specialist in his

field, assisted the jury in finding the extent of respondent's pain and anguish. It was proved that he had suffered from a herniation of the fourth lumbar intervertebral disc. That was determined in February 1953. The disc was then herniated in the midline with the left fifth lumbar nerve root arched over the herniation. The disc was removed to effect a spinal fusion. The resulting rupture pressed on the left side of the fifth lumbar nerve root, causing pain to radiate down the outer aspect of the left leg. Dr. Cuneo, the surgeon, testified that prior to the operation, respondent was totally disabled and that the disability was caused by the cow's falling on respondent's back. Prior to his injury, he had been doing hard work, but subsequent to the accident, he was totally disabled. The testimony of the surgeons established that the injuries were caused by the cow and that repondent was totally disabled until October 1954; that the atrophy of the leg resulted from the new nerve root pressure and could not have been present since 1948; that respondent will have a permanent limitation of motion in his back and will suffer pain for an indefinite period. Contrary to appellants' contention, respondent's work ceased on the day of the accident. It is true that he returned about three weeks thereafter to attempt to work, but his pain forced him to leave at once. The claim that respondent's old injury seriously impaired his ability is contrary to the proof that prior to the accident, and after his remote injury, he had done heavy, manual labor in felling timbers and in carrying a 150-pound saw; stacked timber and operated a lumber truck. After coming to this state he worked as a milker until October 31, 1952. That history evidently and justly convinced the jury that no vestige of the man's earlier accident remained while the testimony of the surgeons that an operation removing the ruptured disc and the fusing of the third, fourth and fifth lumbar vertebrae to the sacrum have resulted in permanent limitation of motion in his back with continuous pain can lead to but one conclusion, to wit, it was all the fruitage of the accident proximately caused by appellants' negligence.

The reduction of the verdict by the court on the hearing of the motion for a new trial in no respect diminishes the appraisal by the jury as implied by their findings. The judge, in the main, agreed with the jury, but pursuant to his concept of his judicial responsibility, he performed a duty in reducing the verdict on being convinced that it was excessive.

## OTHER ASSIGNMENTS OF ERROR

Appellants have gleaned the record for errors at the trial. We discuss them now.

(1) Appellants sought to introduce into evidence a letter sent to the Oregon Industrial Accident Commission relative to respondent's 1946 injury. Expert handwriting analysis indicated that the letter had been written by respondent's wife approximately eight months prior to his embroglio with cow Number 2. The contents of the letter were considered by appellants especially damaging to respondent's claim. They indicated that at the date of such letter respondent was still suffering from the 1946 injury to such an extent as to cause him to attempt to cajole an increase in the Oregon award. However, the trial court excluded the letter as inadmissible hearsay. Appellants now contend that even though the letter had been written by one not a party to the action, still it should have been admitted by virtue of Code of Civil Procedure, section 1870, as follows: "In conformity with the preceding provisions, evidence may be given upon trial of the following facts: . . . (5) . . . act or declaration of a joint owner, joint debtor, or other person jointly interested with the party." The argument is that respondent's wife is "jointly interested" in causes of action possessed by her husband because of the law of community property, citing *Wilcox* v. *Berry*, 32 Cal.2d 189, 192 [195 P.2d 414]. Therefore, they contend, the letter was admissible as a "vicarious admission" or a "declaration against interest."

Although superficially appealing, this contention will stand closer inspection. In what cause of action is respondent's wife alleged to have a community interest? At what point of time is it material that the joint interest be present?

If appellants rely on a community ownership of the 1946 cause of action arising from the injuries incurred in Oregon which were the subject of the correspondence, they have mistaken basic principles of the conflict of laws. Respondent's 1946 cause of action arose in Oregon while the husband and wife were domiciled there. Thus, Oregon law is applicable to determine ownership of the cause of action either because the place of the wrong was in Oregon (*Traglio* v. *Harris*, 104 F.2d 439 [127 A.L.R. 803]), or, if the art of characterization be exercised with a little greater finesse, because marital property rights in personalty or choses in action acquired by a spouse are determined under the laws of the domicile of the acquiring spouse. (*Dow* v. *Gould & Curry*

*S. Min. Co.,* 31 Cal. 629, 652; *Estate of Bruggemeyer,* 115 Cal.App. 525 [2 P.2d 534]; *Shilkret* v. *Helvering,* 138 F.2d 925 [78 App.D.C. 178]; *Justis* v. *Atchison, T. & S. F. R. Co.,* 12 Cal.App. 639 [108 P. 328]; and see Leflar, *"Community Property and Conflict of Laws,"* 21 Cal.L.Rev. 221, 230 et seq.) Under the law of Oregon, causes of action or damages recovered by either spouse are the separate property of that spouse and no joint interest arises merely because of the marital relationship. (*Jennings* v. *Conn,* 194 Ore. 686 [243 P.2d 1080, 1081], correcting loose language in *Marston* v. *Marston,* 187 Ore. 243 [210 P.2d 832]; 41 C.J.S., § 462, p. 988; Ops. Ore. Atty. Gen., 1946-1948, p. 310.)

Therefore, it must be assumed that appellants rely on the "joint ownership" under California community property laws of the cause of action which was precipitated by the unseemly conduct of cow Number 2 and which forms the basis of this lawsuit. ■ However, if this is the argument, it is unavailing in view of the law that the joint interest must have existed *at the time of the extra-judicial utterance* rather than sometime thereafter. In the first place, section 1870, *supra,* is a collation of basic rules of admissibility of evidence which was enacted in 1872. As such, it was no doubt intended to codify in one place established principles of the law of evidence. An early decision rendered prior to the enactment of the section stated the rule of admissibility of hearsay statements of one standing in a joint interest to a party, but expressly qualified the rule by holding that the joint interest must have existed at the time of the utterance. (*Kilburn* v. *Ritchie,* 2 Cal. 145 [56 Am.Dec. 326].) Considering the problem on reason as well as authority, why are the extra-judicial statements of one in joint interest with a party admissible against the party when relating to the subject of their joint concern? The theory must be that although hearsay carries with it the seeds of inherent untrustworthiness because of the unavailability of cross-examination, it is so contrary to human experience that one would knowingly make false statements detrimental to his pecuniary or proprietary interests that such statements must be accorded probative value. The subject of this discussion provides a focal point for a lively debate between two eminent scholars on the rules of evidence, to wit, Professors Morgan and Wigmore. Morgan's position on the "vicarious admissions" of a declarant in joint interest with a party to an action is, in general, that they are admissible only insofar as they are

"declarations against interest" of the declarant at the time of utterance. The reasoning is substantially the same as that detailed above. (Morgan, *"The Rationale of Vicarious Admissions,"* 42 Harv.L.Rev. 461.) However, because Professor Morgan's theory so directly dovetails with our interpretation of section 1870, *supra,* is that of Wigmore contrary? Not at all. In defending his theory of vicarious admissions, Wigmore wrote, ". . . the general idea of receiving vicarious admissions, is that where the third person was, *at the time of speaking,* in circumstances that gave him substantially the same interest to know something about the matter in hand as had the now opponent, and the same motive to make a statement about it, that person's statements have approximately the same testimonial value as if the now opponent had made them." (Wigmore on Evidence, vol. IV, § 1080a, p. 143, emphasis added and author's emphasis deleted.) Therefore, since respondent's wife wrote the letter eight months before acquiring a joint interest with respondent in the instant action, section 1870 is not applicable and the letter was properly excluded from evidence.

This being the case, appellants' contention that a stipulation of the verity of documents on file with the Oregon Industrial Accident Commission was violated will not justify reversal. Conceding the genuineness of the document, accepting as true the testimony of appellants' expert that the letter was written by respondent's wife, it is inadmissible hearsay.

(2) While Mr. Svensk was testifying, he was asked by respondent concerning a quarter-page advertisement of appellants' Inglewood Farms in the Torrance Herald. Over objection, the court admitted a copy of the Herald containing such advertisement. The vice charged to the document is that it is irrelevant, proves nothing about the alleged negligence, and was prejudicial in that "the jury must have assumed that the evidence had some tendency to show that the photographers were the agents" for defendants, or that because defendants paid large sums to the Herald which printed a picture of an operation of appellants, the latter thereby became liable for Svensk's manner of taking the picture. No prejudice resulted from such ruling. The advertisement was merely cumulative. The agreement was between the Herald and appellants that by the latter's payment for the advertisement, they would receive editorial mention.

(3) Assignment is made of the court's excluding Mr. Hartford's testimony "that he would have remembered any

unusual action of a cow such as described in plaintiff's testimony and would have remembered if anyone had yelled, 'Who the hell let you fellows in here?'" The motion was properly granted because it called for a conclusion. The fact that an event occurred at a remote time in the past does not make the rules of evidence inapplicable.

(4) Appellants complain of error in the exclusion of Mr. Voges' testimony that cow Number 2 had been sent to the butcher "in the ordinary and regular course of events." The ruling was correct. It was immaterial whether the cow was sent to the butcher. Also, it was not proved that Voges was the owner of the cow.

(5) Appellants assign as prejudicial the court's exclusion of Stanley Voges' testimony as to the number of flashlight pictures taken in 1946 without adverse reaction of the cows. Such an inquiry involved an incident too remote to be relevant. The court did not exceed the latitude of its discretion by excluding evidence of so remote an event. Even though the ruling had been erroneous, no prejudice could have resulted since the same witness had already testified that he had never seen any sudden reaction of a cow as the "result of any prior pictures taken."

(6) Assignment is made of the court's action in striking the testimony of Stanley Voges. After he had testified that at that time he was not too active in the barn and did not know of the animals that had any vicious propensities, he testified that prior to Darnold's claim that a cow reared and bucked, then jumped on him, he knew that it was a common occurrence in the barn for a cow to kick but he had never heard of any cow's having bucked and jumped and that if any of that type were being used, *"they wouldn't be retained if they were."* The court properly struck the italicized sentence. The witness had already given his evidentiary testimony. What would happen if a cow should buck or jump was a conclusion and opinion and was not competent proof; neither was it responsive to any question.

(7) Appellants assert error in the court's action in striking testimony of witness Howard, a milker. He was asked whether he recalled a discussion among people who came "in regard to the taking of pictures." He remembered once "they said something about taking moving pictures, but I never paid much mind to it. *You know, in every barn they do it . . . Practically all of them I worked at."* The motion to strike the italicized portions was properly sustained. It was a non-

responsive and irrelevant answer and no foundation had been laid for it.

 (8) Appellants assign as error the giving of BAJI's instruction 54-A in that it "charged the jury that Barnard had been guilty of omissions." The only assumption included is that Barnard was superintendent of Inglewood Farms. No act or omission of Barnard except his failure to call out to the milkers prior to the flash was charged as necessarily negligent. The idea expressed is that the acts or omissions of an agent are, in law, the acts or omissions of the principal. It is uncontradicted that Barnard was superintendent of appellants' plant. In the case cited by appellants (*Finney* v. *Curtis*, 78 Cal. 498 [21 P. 120]), the erroneous instruction assumed negligence.

 (9) There is no error in instruction 104-B.[4] The rule is that where a general instruction is correct as far as it goes, the complaining party can get no relief unless at the proper time he requested the court to make the charge more specific or unless appropriate qualifying instructions are denied. (*Shook* v. *Beals*, 96 Cal.App.2d 963, 972 [217 P.2d 56, 18 A.L.R.2d 919].) The instruction is not argumentative and does not invade the province of the jury. (*McKeon* v. *Lissner*, 193 Cal. 297, 305 [223 P. 965].)

The judgment is affirmed.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied August 13, 1956, and appellants' petition for a hearing by the Supreme Court was denied September 13, 1956. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.

---

[4]104-B: When the negligent acts or omissions of two or more persons, whether committed independently or in the course of jointly directed conduct, contribute concurrently, and as proximate causes, to the injury of another, each of such persons is liable in the absence of contributory negligence. This is true regardless of the relative degree of the contribution. It is no defense for one of such persons that some other person, not here as a defendant in the action, participated in causing the injury even if it should appear to you that the negligence of that other person was greater in either its wrongful nature or its effect.